**WARTSILA NSD NORTH AMERICA, INC., Plaintiff,**

v.

**HILL INTERNATIONAL, INC., Defendant/Third–Party Plaintiff,**

v.

**John H. Clegg, Esquire, Daphne McNutt, Esquire, and Chaffe, McCall, Phillips, Toler & Sarpy, L.L.P. Third–Party Defendants.**

**Civil Action No. 99–4565 (SSB).**

United States District Court, D. New Jersey.

June 19, 2003.

Michael Ochs Adelman, Esq., Drinker Biddle & Shanley LLP, Florham Park, NJ, for Plaintiff Wartsila NSD North America.

Jane Ward Voegele, Esq., Dechert, Price & Rhoads, Princeton, NJ, for Defendant/Third–Party Plaintiff Hill International, Inc.

Marianne Johnston, Esq., Stradley, Ronon, Stevens & Young, Cherry Hill, NJ, for Third–Pary Defendants John H. Clegg, Esq., Daphne McNutt, Esq., and Chaffe, McCall, Phillips, Toler & Sarpy LLP.

**OPINION REGARDING THIRD–PAR-TY DEFENDANTS' MOTION TO DISMISS HILL INTERNATIONAL, INC.'S THIRD PARTY COM-PLAINT FOR LACK OF PERSON-AL JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(2)**

BROTMAN, District Judge.

Defendant/Third Party Plaintiff Hill International, Inc. ("Hill") filed a third party complaint in this action on August 20, 2001, seeking contribution (Count I) and indemnification (Count II) from third party defendants, John H. Clegg, Esq.("Clegg"), Daphne McNutt, Esq. ("McNutt"), and Chaffe, McCall, Phillips, Toler & Sarpy LLP ("Chaffe firm"). Each of the third party defendants now moves, pursuant to Federal Rule of Civil Procedure 12(b)(2), to dismiss Hill's third party complaint based on this Court's purported lack of personal jurisdiction. For the reasons set forth below, that motion will be denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In July 1994, Wartsila Diesel, Inc., an engineering and construction company and the predecessor to Plaintiff Wartsila NSD North America, Inc. ("Wartsila"), entered into a contract with Coastal Salvadorian Ltd. ("Coastal"), wherein Wartsila agreed to design, engineer, procure, construct, start up and test a diesel engine power plant in Nejapa, El Salvador ("the Project"). (Pl.'s First Supplemental & Amended Complaint at ¶ 6). Wartsila, whose business had up to that point focused primarily on the sale and maintenance of diesel engines, in turn subcontracted much of the plant's construction to a variety of other entities, including Black & Veatch International ("BVI"). (Id. at ¶¶ 7–8). The Project quickly fell behind schedule, resulting in numerous contractual disputes between Wartsila, BVI, and Coastal. (Id. at ¶ 9). In an effort to get the project back on track, Wartsila sought the services of a construction consulting firm that could provide expert advice and management for the Project. (Id. at ¶ 10).

On January 18, 1995, Hill International, Inc. submitted a proposal for the consulting position. (Id. at ¶ 31). In its proposal, Hill recommended that Richard LeFebvre, one of the firm's senior consultants, be assigned to the Project to "collect, organize and evaluate ... factual information and report.. his findings as to the best way to proceed with the completion of the project." (Id. at ¶ 33). LeFebvre's responsibilities were to include gathering information and materials related to the construction project, visiting the project site "to evaluate the adequacy of the plans and specifications," and comparing the actual performance of the construction work to Wartsila's obligations under its contract with Coastal. (Id.). Attached to the proposal was a copy of LeFebvre's professional resume which represented that he: (a) had received a B.S. in electrical engineering from Penn State in 1966; (b) had earned a B.A. in business administration from Duquesne University in 1969; (c) had taken courses in business law at the University of North Florida in 1983; and (d) was registered and licensed as a professional en-

gineer in Pennsylvania, New York, and Massachusetts. (*Id.* at ¶ 32).

On January 24, 1995, Wartsila and Hill entered into a written consulting agreement that incorporated by reference the January 18 proposal. (*Id.* at ¶ 34). Pursuant to the terms of the agreement, Hill assigned LeFebvre to work as a senior consultant on the Project. (*Id.* at ¶ 35). LeFebvre was quickly promoted by Wartsila to the position of Project Manager and continued to work on the Project as a Hill employee until May 25, 1995. (*Id.* at ¶¶ 37, 40). Among his responsibilities was the task of analyzing issues bearing on potential claims and defenses in contractual disputes between Wartsila and BVI. (*Id.* at ¶¶ 38–39).

On June 1, 1995, with Hill's approval, Wartsila hired LeFebvre "as an independent contractor to provide assistance with construction and claims management on the Project." (*Id.* at ¶ 41). Based in part on LeFebvre's analysis and recommendations, Wartsila in May 1996 decided to pursue claims against BVI before the American Arbitration Association and retained the Louisiana law firm of Chaffe, McCall, Phillips, Toler & Sarpy, L.L.P., and two of its attorneys, John H. Clegg, Esq., and Daphne McNutt, Esq., to initiate arbitration proceedings against BVI in Charlotte, North Carolina. (*Id.* at ¶ 43; Third Party Complaint at ¶ 11). LeFebvre became a "key witness" in the proceedings due to his intimate and extensive knowledge of the facts underlying the points of contention between the two parties and his participation in the drafting of various "claim support" documents. (Pl.'s First Amended Compl. at ¶¶ 43–44).

At the arbitration proceedings in September 1997, LeFebvre offered testimony regarding the academic and professional credentials listed on his resume. (*Id.* at ¶ 47). On September 8, 1997, toward the end of his direct testimony, Wartsila became aware, "for the first time," that there were questions concerning LeFebvre's educational and professional credentials when counsel for BVI requested that LeFebvre execute a release for background academic information. (*Id.* at ¶ 48). Later that day, after the proceedings had been adjourned, LeFebvre admitted to Wartsila's attorneys that the statements on his resume concerning a business degree from Duquesne University were not accurate. (*Id.* at ¶ 49). He allegedly told Wartsila that Hill had asked him to overstate the extent of his training at Duquesne. (*Id.*).

The next morning, LeFebvre requested and received from Hill a revised resume which omitted any reference to a business degree from Duquesne or business law courses at North Florida and modified the date on which he claimed to have received an electrical engineering degree from Penn State. (*Id.* at ¶ 50). When the proceedings resumed later that day, BVI's attorneys subjected LeFebvre to a vigorous cross-examination, forcing him to acknowledge the obvious inconsistencies between the two resumes. LeFebvre nevertheless insisted that the revised resume was entirely accurate and truthful. (*Id.* at ¶ 50(b)). However, by the conclusion of the day's proceedings, Wartsila's attorneys were forced to concede that a hasty investigation into LeFebvre's academic credentials had uncovered no evidence that he had ever received an engineering degree from Penn State or attended any of the other schools listed on his resume. (*Id.* at ¶ 51). Wartsila also found no evidence that LeFebvre had ever been licensed as a professional engineer in either New York, Pennsylvania, or Massachusetts. (*Id.*).

In light of LeFebvre's perjury, Wartsila's counsel withdrew his testimony, and

the arbitration panel granted Wartsila a short recess to restructure its case based on new witnesses. (*Id.* at ¶ 53). During that time, the company re-examined materials prepared by LeFebvre and discovered that he had improperly altered original "claim support" documents. (*Id.* at ¶ 53). Consequently, Wartsila was forced to withdraw certain claims. (*Id.*). On March 5, 1998, the arbitration panel issued a judgment of $4.65 million in favor of BVI. (*Id.* at ¶ 57). Wartsila attributes the arbitration award to the complete loss of credibility it allegedly suffered as a result of LeFebvre's blatant misrepresentations, both on his resume and in his testimony before the arbitration panel. (*Id.* at ¶ 52).

In November 1997, shortly after LeFebvre was exposed as a fraud and a perjurer, BVI brought claims in tort and contract against Wartsila in the United States District Court for the District of Kansas ("Kansas litigation"). (*Id.* at ¶ 58, 60). The lawsuit was based on Wartsila's "placement of an individual lacking in the necessary education, skills, professional licenses and trustworthiness as Project Manager charged with oversight of BVI's work." (*Id.* at ¶ 59). Wartsila ultimately settled this dispute with BVI for $850,000. (*Id.* at ¶ 61).

Wartsila thereafter retained attorneys Clegg and McNutt, who had since left the Chaffe firm to join the New Orleans law firm of McGlinchey Stafford, LLC, to initiate litigation against Hill in the United States District Court for the District of New Jersey. As amended, Wartsila's complaint asserts claims for negligence, fraud, and breach of contract and seeks recovery of both compensatory and punitive damages for the harm allegedly suffered as a result of the misrepresentations concerning LeFebvre's academic and professional credentials, including amounts paid to Hill and LeFebvre for services rendered, a portion of the arbitration

award, and the $850,000 paid in settlement of the Kansas lawsuit.

On August 20, 2001, Hill filed a third party complaint asserting claims for contribution (Count I) and indemnification (Count II) against Clegg, McNutt, and the Chaffe law firm (hereinafter collectively referred to as "Defendants"). Hill's complaint alleges that, as counsel for Wartsila during the BVI arbitration proceedings, Defendants acted "recklessly and negligently" by: (1) failing to investigate and verify LeFebvre's educational and professional credentials before presenting him as Wartsila's key fact witness (Third Party Complaint at ¶ 33); and (2) "assert[ing] claims and submitt[ing] documents prepared by LeFebvre to the arbitration panel without having previously checked the accuracy of those claims and/or documents." (*Id.* at ¶ 34). The complaint further alleges that it was the Defendants' failure to provide Wartsila with "adequate legal representation" which "caused the losses Wartsila allegedly sustained in both the BVI arbitration and the Kansas litigation." (*Id.* at ¶ 36).

On August 8, 2002, Defendants filed the instant motion to dismiss Hill's third party complaint for lack of personal jurisdiction. Hill was granted permission to undertake limited jurisdictional discovery before responding to Defendants' motion. Now that such discovery has been completed and Hill has filed its opposition brief, Defendants' motion to dismiss is ripe for consideration by this Court.

## II. LEGAL STANDARD GOVERNING A MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION UNDER FED. R. CIV. P. 12(b)(2)

"When a defendant raises the defense of the court's lack of personal jurisdiction, the burden falls upon the plaintiff

to come forward with sufficient facts to establish that jurisdiction is proper." *Mellon Bank (East) P.S.F.S. v. Farino*, 960 F.2d 1217, 1223 (3d Cir.1992). In ruling on a motion to dismiss, the court must accept as true the well-pleaded, material allegations contained in the plaintiff's complaint and afford plaintiff the benefit of all reasonable inferences which can be drawn therefrom. *See Carteret Savings Bank, FA v. Shushan*, 954 F.2d 141, 142 n. 1 (3d Cir.1992). Still,

> a Rule 12(b)(2) motion, such as the motion made by the defendants here, is inherently a matter which requires resolution of factual issues outside the pleadings, *i.e.* whether *in personam* jurisdiction actually lies. Once the defense has been raised, then the plaintiff must sustain its burden of proof by establishing jurisdictional facts through sworn affidavits and competent evidence ... [A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. Once the motion is made, plaintiff must respond with actual proofs, not mere allegations.

*Patterson v. Federal Bureau of Investigation*, 893 F.2d 595, 603–04 (3d Cir.1990) (citation omitted) (quoting *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 67 n. 9 (3d Cir.1984)). A plaintiff can meet its burden of proof and present a *prima facie* case for the court's exercise of personal jurisdiction by establishing "with reasonable particularity sufficient contacts between [each] defendant and the forum state." *Mellon Bank*, 960 F.2d at 1223.[1]

## III. IN PERSONAM JURISDICTION

Rule 4(e) of the Federal Rules of Civil Procedure authorizes a district court to exercise personal jurisdiction over a non-resident defendant to the extent allowed by the long-arm statute of the state in which the court sits. *See Sunbelt Corp. v. Noble, Denton & Associates, Inc.*, 5 F.3d 28, 31 (3d Cir.1993). New Jersey's long-arm statute permits the exercise of personal jurisdiction over a non-resident defendant to the fullest extent permitted by the Due Process Clause of the Fourteenth Amendment. *See* N.J. Ct. R. 4:4–4(c)(1); *see also Carteret Savings Bank*, 954 F.2d at 145. Consequently, the question of whether this Court may properly exercise personal jurisdiction over each of the defendants named in Hill's third party complaint is determined by federal constitutional law. *See Decker v. Circus Circus Hotel*, 49 F.Supp.2d 743, 746 (D.N.J.1999) (citing *Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 698 (3d Cir.1990)).

The determination of whether a court can assert personal jurisdiction over a non-resident defendant within the limits imposed by the Due Process Clause generally requires a two-step analysis. The court must first determine "whether the defendant has had the minimum contacts with the forum [state] necessary for the defendant to have 'reasonably anticipated being hailed into court there.' " *Decker*, 49 F.Supp.2d at 746 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). A plaintiff can establish the requisite "minimum contacts" by either "showing that the defendant has had continuous and systematic contacts with the

---

1. Although Hill "will ultimately have to establish jurisdiction by a preponderance of the evidence, at this juncture it need only make a *prima facie* showing that the Court has personal jurisdiction over" each of the defendants named in its third party complaint. *Osteotech v. GenSci Regeneration Sciences, Inc.*, 6 F.Supp.2d 349, 353 (D.N.J.1998) (citing *Carteret Sav. Bank*, 954 F.2d at 146).

forum (general jurisdiction) or that [its] cause of action arose out of [the] defendant's activities with the forum state (specific jurisdiciton)." *Osteotech*, 6 F.Supp.2d at 353 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). In either case, "it is essential ... that there be some act by which the defendant *purposefully avails* itself of the privilege of conducting activities in the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (emphasis added); *see also Covenant Bank for Savings v. Cohen*, 806 F.Supp. 52, 56 (D.N.J.1992) (Brotman, J.). "A single, unsolicited contact, random or fortuitous acts, or the unilateral acts of others (including the plaintiff) [will] not constitute a purposeful connection between the defendant and the forum state." *Osteotech*, 6 F.Supp.2d at 353 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)); *see also Covenant Bank*, 806 F.Supp. at 55. Once the plaintiff has made a *prima facie* showing that the defendant has had the requisite "minimum contacts" with the forum state, those "contacts may then be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' " *Burger King*, 471 U.S. at 476, 105 S.Ct. 2174 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

## IV. ANALYSIS

### A. Minimum Contacts

■ For purposes of assessing whether a defendant has had sufficient "minimum contacts" with a particular forum, the Supreme Court has generally distinguished between two types of *in personam* jurisdiction. The first, known as "specific jurisdiction," requires the court to examine "the relationship among the defendant, the forum [state] and the [plaintiff's] cause of action to determine whether the defendant had 'fair warning' that [he or she] could be brought to suit here." *Osteotech*, 6 F.Supp.2d at 354 (citing *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)). Specific jurisdiction over a non-resident defendant is only appropriate when the plaintiff's cause of action arises out of or directly relates to the defendant's purposeful contacts with the forum state. *See Osteotech*, at 354 (citing *Giangola v. Walt Disney World Co.*, 753 F.Supp. 148, 154 (D.N.J.1990)). Put simply, where a defendant's deliberate "forum-related conduct ... form[s] the basis of the [plaintiff's] alleged injuries and the resulting litigation," the court may presume that it is reasonable to expect the defendant to have anticipated being brought to suit in the forum. *Osteotech*, at 354.

■ Alternatively, a defendant may be exposed to the "general jurisdiction" of the court when his or her contacts with the state in which the court sits are sufficiently "continuous and substantial" such that the defendant should have reasonably anticipated being hailed into court in that forum. *See Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir.2001). When general jurisdiction exists, a defendant will be subject to the court's jurisdiction regardless of whether there is any specific connection between his forum-related contacts and the events or conduct which gave rise to the plaintiff's claims and the resulting litigation. *See id.* (noting that a non-resident defendant's "continuous and substantial" contacts with the forum state may permit a court to assert "general jurisdiction" over him even though the plaintiff's cause of action arises out of or results from the defendant's activities outside the forum); *see also Osteotech*, 6 F.Supp.2d at 353 ("As

long as the defendant maintains continuous and substantial contacts with the forum generally, the contacts need not be specifically related to the underlying cause of action in order for personal jurisdiction over the defendant to be proper."). When general jurisdiction is asserted, the "minimum contacts" analysis tends to be more demanding. Thus, as this Court has observed, "[a]n assertion of general jurisdiction [will be] consistent with due process only when the plaintiff has satisfied the 'rigorous' burden of establishing that the defendant's contacts are continuous and substantial." *Covenant Bank*, 806 F.Supp. at 57 (citing *Giangola*, 753 F.Supp. at 154); *see also Exton v. Our Farm, Inc.*, 943 F.Supp. 432, 437 (D.N.J.1996).

### Attorney Clegg

Attorney Clegg's contacts with the state of New Jersey can be divided into two categories. The first set of contacts relate to his role as counsel for Wartsila in the BVI arbitration. Clegg was working as an attorney with the Chaffe firm in 1996 when that firm was retained by Wartsila to initiate arbitration proceedings against BVI in Charlotte, North Carolina. The evidence in the record establishes that in September of that year, Clegg and one of the firm's associates working under his direct supervision sent two pieces of correspondence concerning the BVI arbitration to LeFebvre's home in New Jersey. (*See* correspondence dated Sept. 3, 1996 and Sept. 30, 1996, attached as Ex. N to Hill's Opp. Br.). This is the extent of the evidence concerning Clegg's contacts with New Jersey during the BVI proceedings.[2]

Clegg's other contacts with New Jersey stem from his involvement in the action presently before this Court. Clegg, now a partner with the New Orleans law firm of McGlinchey Stafford, has "assisted" Wartsila in prosecuting its claims against Hill since this action was first filed in this Court on September 22, 1999. (*See* Clegg Dep. 4/2/02 at 73, attached as Ex. E to Hill's Opp. Br.). Indeed, he was involved in the preparation of Wartsila's initial complaint and, in February 2001, filed an application seeking *pro hac vice* admission to this Court for purposes of serving as counsel to Wartsila in this matter. (*Id.* at 33; Docket Entry Nos. 23–25; Clegg's Pro Hac Vice Application, attached as Ex. F to Hill's Opp. Br.).

Although Clegg was granted only "limited" *pro hac vice* admission, he has been actively involved in the preliminary stages of this case. Indeed, he has traveled to New Jersey on at least six separate occasions for purposes of taking or defending depositions in this case. *See* Pl.'s Opp. Br., Ex. G (Cover Pages of Transcripts for the Deps. of M. Jablonski and C. Emma on 2/6/01; M. Maier on 2/7/01; I. Richter on 4/11/01; T. Astrom and M. Schroeder on 4/12/01; A. Ramirez on 8/29/01; D. Richter on 5/11/01 and 8/29/01; W. Dengler on 8/29/01). He has also traveled to New Jersey on at least one other occasion to participate in a court hearing before this Court concerning the propriety of Hill's proposed third party complaint. (See Clegg's Response to Jurisdictional Interrog. No. 3, attached as Ex. H to Pl.'s Opp. Br.). Finally, Clegg admits that he has either "sent to or received from" New Jersey approximately 70 pieces of correspondence related to this case and "estimates" that he personally made approximately 50 phone calls to Wartsila's New

---

**2.** In its opposition brief, Hill also notes that "at least sixteen phone calls were made to New Jersey from the Chaffe law firm during the BVI arbitration." (Opp. Br. at 15). However, because Hill is unable to specifical-

ly link any of these phone calls to Clegg, these "contacts" do not factor into the Court's determination as to whether Clegg himself is personally amenable to suit in this jurisdiction.

Jersey counsel to discuss issues connected to this litigation. (*See* Clegg's Response to Jurisdictional Interrog. Nos. 2 and 3, attached as Ex. H to Pl.'s Opp. Br.).

■ Attorney Clegg's contacts with the New Jersey do not provide a basis for exercising specific personal jurisdiction over him. As the Court has noted, specific jurisdiction over a non-resident defendant is only appropriate where the plaintiff's cause of action arises out of or directly relates to the defendant's forum-related contacts. From the allegations in Hill's third party complaint, it is clear that Hill's claims for contribution and indemnification arise out of or result from Clegg's alleged failure to provide Wartsila with "adequate legal representation" during the BVI arbitration proceedings in Charlotte, North Carolina. Specifically, Hill alleges that Clegg acted "recklessly and negligently" by allowing LeFebvre to submit "claims support" documents to the BVI arbitration panel and to testify during the proceedings without first verifying the reliability of those documents and the professional credentials listed on his resume. (Third Party Compl. at ¶¶ 33–34). Based on these allegations and the evidence in the record, it appears that most, if not all, of this allegedly tortious conduct occurred not in New Jersey but in Louisiana and in North Carolina, the site of the BVI arbitration.

Of the New Jersey contacts Hill has identified, the only two which have any possible connection to Clegg's allegedly tortious conduct during the BVI arbitration are the two pieces of correspondence which Clegg and one of his associates mailed to LeFebvre's New Jersey address in the months leading up to his testimony before the arbitration panel. However, the link between these letters and the specific events or conduct that gave rise to this litigation is tangential, at best. The first letter, which is dated September 3, 1996, nearly a year before LeFebvre's testimony, is nothing more than a cover letter for an internal memorandum summarizing the various "issues" Wartsila and BVI were expected to raise during the arbitration proceedings. (*See* Pl.'s Opp. Br., Ex. N). In the second letter, which was sent approximately one month later, an associate working under Clegg's supervision merely asks LeFebvre whether he has any photographs, videotapes, or models of the project site which might assist the firm's attorneys in an upcoming conference with members of the arbitration panel. (*Id.*). Thus, while these letters deal generally with issues related to the BVI arbitration, they make no mention of LeFebvre's resume, his proposed testimony, or the "claims support" documents he was involved in preparing—that is, they are unrelated to the specific events and alleged tortious conduct which forms the basis of Hill's third party claims. Put simply, the relationship between these two letters and the allegedly "reckless and negligent" actions which form the basis of Hill's third party claims against Clegg is too remote to establish a basis for asserting specific personal jurisdiction over him.

Hill also attempts to argue that the contacts Clegg has had with this Court in connection with the present litigation provide a basis for exercising specific personal jurisdiction over him. Specifically, Hill argues that its third party claims against Clegg "arise out of" his decision to assist Wartsila in pursuing its claims against Hill in the courts of this state. (Pl.'s Opp. Br. at 16). Because its third-party claims against Clegg are "entirely derivative," Hill argues, it would have had no cause of action against Clegg had Wartsila not initiated litigation against it in this state. (*Id.* at 17). However, Hill confuses the nature of the contacts which are necessary to support the exercise of specific personal jurisdiction. In determining whether the court has specific jurisdiction over a partic-

ular defendant, the focus is on the relationship between that defendant's contacts with the forum and the plaintiff's claims, not the relationship between the plaintiff's claims and the underlying litigation. Here, under the theory advanced in its third party complaint—*i.e.*, that Clegg's "reckless and negligent" failure to detect and prevent LeFebvre's perjurious testimony before the BVI arbitration panel caused the losses suffered by Wartsila in those proceedings and the subsequent Kansas litigation—Hill would have had a basis for asserting third party claims against Clegg regardless of whether or not he had ever been retained to represent Wartsila in the present lawsuit. In other words, the underlying factual basis for Hill's third party claims exists independent of the actions Clegg has undertaken on Wartsila's behalf in connection with the instant litigation. Thus, Hill's claims for contribution and indemnification cannot be considered to have "arisen out of" or resulted from Clegg's contacts with this Court. *See Remick*, 238 F.3d at 255 ("specific jurisdiction is present only if the plaintiff's cause of action arises out of a defendant's forum-related activities"); *Burke v. Quartey*, 969 F.Supp. 921, 924 (D.N.J.1997) (Brotman, J.) (observing that to establish specific jurisdiction, plaintiff must demonstrate that its "cause of action arose out of" the defendant's New Jersey-related activities or conduct).

Nevertheless, the Court finds it highly significant that Attorney Clegg has voluntarily assumed and maintained an ongoing attorney-client relationship with Wartsila in connection with this litigation. Indeed, while Courts of Appeals in several jurisdictions have observed that "the mere existence of an attorney-client relationship, unaccompanied by other sufficient contacts with the forum, does not confer personal jurisdiction over" a non-resident attorney, *Sawtelle v. Farrell*, 70 F.3d 1381, 1392 (1st Cir.1995); *Trinity Industries, Inc. v.*

*Myers & Associates, Ltd.*, 41 F.3d 229, 231 (5th Cir.1995) (observing that the "bare existence of an attorney-client relationship is not sufficient" to justify exercising personal jurisdiction over a non-resident attorney), the decision of our Court of Appeals in *In Re: Prudential Insurance Company of America Sales Practices Litig.*, 314 F.3d 99 (3d Cir.2002), would appear to suggest otherwise. The plaintiffs in *In Re: Prudential Insurance* were "New Jersey residents who [had] purchased nine life insurance policies from Prudential for themselves and their children" and subsequently became "unnamed members in a nationwide federal class action involving the fraudulent sale of insurance policies by [Prudential's] agents." *Id.* at 100–101. The class action, which was settled in 1997, paid out more than four billion dollars to eight million class members through a comprehensive alternative dispute resolution program. *Id.* at 100. Although plaintiffs received their full allotment of the proceeds under the settlement, they were dissatisfied with the manner in which Prudential had handled their claims and retained the Illinois law firm of Reardon, Golinkin & Reed to file various state law claims against the carrier in Illinois state court. *Id.* at 101. Prudential subsequently removed the case to the United States District Court for the Northern District of Illinois seeking to enjoin plaintiffs from prosecuting their claims in the Illinois state courts. *Id.* at 100, 102. About a month later, an order was issued by the Judicial Panel on Multidistrict Litigation ("MDL panel") transferring the case to the United States District Court for the District of New Jersey. *Id.* at 102.

In challenging the removal and subsequent transfer of their lawsuit to the New Jersey district court, plaintiffs argued, among other things, that the district court lacked personal jurisdiction over the Illi-

nois attorneys they had retained to pursue their claims in Illinois state court. However, the Court of Appeals promptly rejected this argument. In doing so, the Court offered the following explanation:

> Plaintiffs ... maintain [that] the district court lacked personal jurisdiction over Reardon, Golinkin & Reed, as it is an Illinois law firm with insufficient contacts with New Jersey for the court to assert jurisdiction over it. But the firm represents [plaintiffs] in matters related to the Prudential class action, and the District Court undisputably had jurisdiction over them. *"Because the District Court had personal jurisdiction over members of the ... class, it also had jurisdiction over attorneys purporting to represent, and act on behalf of"* members of that class, including the [plaintiffs].

*In re Prudential Insurance,* 314 F.3d at 103 n. 7 (quoting *In re Diet Drugs,* 282 F.3d 220, 231 (3d Cir.2002)) (emphasis added); *see also In re Diet Drugs,* 282 F.3d at 231 (observing that "traditional notions of fair play and substantial justice are [not] offended" when a district court exercises personal jurisdiction "over attorneys purporting to represent, and act on behalf of" class action plaintiffs who are clearly subject to the court's jurisdiction).

■ The Court's reasoning would appear to apply with equal, if not greater force, in the situation the Court is presented with here. Clegg not only "purports to represent and act on behalf" of Wartsila, a party over whom this Court unquestionably possesses personal jurisdiction, in matters directly related to its underlying claims against Hill, he has, in fact, been actively involved in "assisting" Wartsila with the prosecution of those claims through a steady exchange of correspondence and telephonic communication with Wartsila's New Jersey counsel. He has also traveled to the state on several occasions to take and defend the deposition of witnesses in this matter. Perhaps most significantly, Clegg has applied for and been granted *pro hac vice* admission to this Court for purposes of acting as counsel for Wartsila in this matter. By doing so, Clegg has clearly availed himself of the privileges and benefits of practicing law before the federal courts of this state. Accordingly, the Court is satisfied that, under *In Re Prudential Insurance,* Attorney Clegg's deliberate and purposeful contacts with this forum in connection with the instant litigation have exposed him to the jurisdiction of this Court.

### *Attorney McNutt*

Like Clegg, Attorney McNutt was a member of the Chaffe law firm in 1996 when that firm was retained to represent Wartsila in arbitration proceedings against BVI in North Carolina. However, there is no evidence in the record that McNutt had any contacts with New Jersey during the course of the arbitration. Consequently, the only forum-related contacts which Hill has identified with respect to Attorney McNutt stem from her involvement in the litigation presently before the Court.

■ Attorney McNutt, like Clegg, has been granted limited *pro hac vice* admission to this Court to act as counsel to Wartsila in connection with its underlying claims against Hill. (Docket Entry Nos. 23–25; McNutt's Pro Hac Vice Application, attached as Ex. F to Hill's Opp. Br.). However, unlike Clegg, her contacts with New Jersey have, to date, been limited almost exclusively to telephonic and mail communication. According to the evidence in the record, she has either "sent or received from New Jersey" approximately ten pieces of correspondence and has spoken to Wartsila's New Jersey counsel over the phone on approximately ten to fifteen occasions. (See McNutt's Response to

Jurisdictional Interrog. Nos. 1–3, attached as Ex. J. to Hill's Opp. Br.). She has also traveled to New Jersey to participate in a hearing before this Court concerning the propriety of Hill's third party complaint. (*Id.*). Nevertheless, under *In Re Prudential Insurance*, by seeking *pro hac vice* admission to this Court and purporting to "represent and act on behalf of" the plaintiff in this litigation, she, too, has voluntarily exposed herself to the jurisdiction of this Court.

### *Chaffe, McCall, Phillips, Toler & Sarpy, LLP*

The evidence in the record concerning the Chaffe law firm's contacts with New Jersey consists of the following:

- In September 1996, Attorney Clegg, who was then a partner with the firm, and Charles Blanchard, one of the firm's associates, sent two pieces of correspondence to LeFebvre's home in New Jersey. (*See* Hill's Opp. Br., Ex. N).
- During the BVI arbitration proceedings, at least sixteen phone calls were made to New Jersey from the firm's offices in New Orleans. (*See* Clegg's Supplemental Answers to Jurisdictional Interrog. No. 2, attached as Ex. K to Hill's Opp. Br.; *see also* Hill's Opp. Br., Ex. O).
- Since 1993, the Chaffe firm has been retained by approximately fourteen corporate clients with offices in New Jersey to provide legal services in connection with litigation or transactions in Louisiana and in other state besides New Jersey. (*See* Chaffe's Response to Jurisdictional Interrog. No. 5, attached as Ex. 1 to Def.s' Reply Br.).
- Over the course of the past nine years, the firm's attorneys have sent approximately 209 pieces of correspondence to New Jersey in connection with the firm's representation of businesses with offices in New Jersey in matters pending in Louisiana and elsewhere outside the state. (*See* Chaffe's Response to Jurisdictional Interrog. No. 1, attached as Ex. 1 to Def.s' Reply Br.).
- During that time, the firm's attorneys have traveled to New Jersey on 20 or more separate occasions to depose witnesses and meet with the firm's corporate clients in connection with matters pending in Louisiana and elsewhere outside New Jersey. (*See* Chaffe's Response to Jurisdictional Interrog. No. 3, attached as Ex. 1 to Defs.' Reply Br.).

These contacts do not provide a basis for asserting specific jurisdiction over the Chaffe law firm. First, the vast majority of these contacts are completely unrelated to the litigation presently before this Court. Second, for reasons the Court has already discussed, the connection between the two letters Clegg sent to LeFebvre's New Jersey address in September 1996 and the allegedly "reckless and negligent" conduct which forms the basis of Hill's third party claims is too attenuated to justify asserting specific personal jurisdiction over either Clegg or the Chaffe law firm. Finally, Hill has not presented any evidence establishing a specific connection between the events which gave rise to its third party claims and the sixteen phone calls which were made to New Jersey from the firm during the course of the BVI arbitration.

Accordingly, because Hill's third claims do not "arise out of" or result from the Chaffe firm's forum-related conduct or activities, this Court may assert personal jurisdiction over the firm only if its contacts with New Jersey are otherwise sufficiently "continuous and substantial" such that it should have reasonably anticipated being compelled to defend itself in this

state. *See Remick*, 238 F.3d at 255. "[T]he facts required to assert this 'general' jurisdiction must be 'extensive and persuasive.'" *Reliance Steel Prods. v. Watson, Ess, Marshall*, 675 F.2d 587, 589 (3d Cir. 1982). Moreover, as with specific jurisdiction, "it is essential that there be some act by which the defendant [has] purposefully avail[ed] itself of the privilege of conducting activities in [New Jersey], thus invoking the benefits and protections of [the state's] laws." *Covenant*, 806 F.Supp. at 56 (citing *Hanson*, 357 U.S. at 253, 78 S.Ct. 1228).

■ With these principles in mind, the Court is satisfied that Hill has made out a *prima facie* case in favor of asserting general jurisdiction over the Chaffe law firm. While there is no evidence that the firm maintains offices in New Jersey or that any of its attorneys have ever been admitted to practice in the courts of this state, since 1993, the firm has been retained to represent at least 14 different corporate clients with offices in New Jersey. In connection with its representation of these New Jersey clients, the firm has sent numerous pieces of correspondence into the state. *See Grand Entm't Group, Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir.1993) ("Mail and telephone communications sent by the defendant into the forum may count toward the minimum contacts necessary to support jurisdiction."); *see also Sawtelle*, 70 F.3d at 1389–

1390 (noting that the "transmission of information into [the forum state] by way of telephone or mail" is a "contact" with the state for purposes of determining whether a nonresident defendant has sufficient contacts with the state to allow the exercise of personal jurisdiction over him consistent with due process). Perhaps most significantly, the firm's attorneys have made several visits to New Jersey for purposes of conducting depositions and consulting with the firm's New Jersey clients. Through these contacts, the firm has purposefully availed itself of the privilege of conducting business activities within the state.[3] *See Carteret Savings Bank v. Shushan*, 954 F.2d 141, 149–150 (3d Cir.1992) (concluding that an attorney from a Louisiana law firm [whom the plaintiff, a New Jersey savings bank, had hired to serve as local counsel in a real estate transaction concerning a Louisiana construction project] had "purposefully availed himself of the privileges of acting within New Jersey by traveling to New Jersey [to attend meetings and "consult with his client"] as well as by communicating [both through telephone calls and letters] with clients within the forum state"); *see also Trinity*, 41 F.3d at 231 (concluding that a group of Illinois patent attorneys had "purposefully availed themselves of the privilege of doing business in Texas" by voluntarily assuming and maintaining an attorney-client relationship with a Texas-based corporation

---

3. Defendants argue that there is "no evidence that Chaffe advertises or regularly markets its services to New Jersey residents or businesses." (Def.s' Reply Br. at 14). Chaffe also argues that on those occasions where the firm's attorneys have traveled to New Jersey to take depositions and attend meetings, they have done so solely for the convenience of the firm's New Jersey clients. (Def.'s Br. at 14). However, neither of these arguments persuade the Court that the firm's forum-related activities fail to satisfy the "purposeful availment" requirement. *See Carteret*, 954 F.2d at 150 ("We decline to attach significance to the

[firm's] allegation that [its attorney] did not solicit" the business of its New Jersey client, as "the 'purposeful availment' necessary for due process purposes was met by [his] act of traveling to New Jersey to consult with his client.") (citations omitted); *see also id.* ("We decline to adopt the defendants' position that personal jurisdiction should turn upon whether [the firm's New Jersey client] invited [its attorney] to the Roseland, New Jersey meeting or [the attorney] himself initiated that meeting since the operative fact is that [the attorney] attended [the] meeting in New Jersey.").

through, among other things, "regular mail and telephonic communications" to the client's Texas offices and occasional visits to Dallas for meetings with the client); *see also Burke,* 969 F.Supp. at 928 ("[B]y entering New Jersey and purposefully availing himself of the benefits of conducting business here, the defendant is charged with foreseeing the possibility of litigation here."). Moreover, the steady stream of correspondence which the firm has sent to its New Jersey clients, together with its attorney's repeated visits to this state to meet and consult with those clients, suffices to establish the type of "continuous and substantial" contacts which are required to make out a *prima facie* basis for asserting general jurisdiction. *See Covenant,* 806 F.Supp. at 58 n. 9 (noting that to establish a basis for exercising general jurisdiction, the plaintiff need not necessarily demonstrate that the defendant has had "daily contacts" with the forum state, so long as the defendant is shown to have had "a substantial level of regular, purposeful contact directed to the forum" and its residents).

### B.   Traditional Notions of Fair Play and Substantial Justice

Once the plaintiff has made out a *prima facie* case in favor of personal jurisdiction, the burden shifts to the defendant who "must present a *compelling* case that the presence of some other considerations would [nevertheless] render jurisdiction unreasonable.'" *Carteret Savings Bank,* 954 F.2d at 150 (quoting *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174) (emphasis added); *see also Mellon Bank,* 960 F.2d at 1226 ("[O]nce the plaintiff has made a prima facie case for jurisdiction based upon minimum contacts, the burden falls upon the defendant to show that the assertion of jurisdiction is *unconstitutional.* This burden is met when the defendant demonstrates to the court that factors are present that make the exercise of jurisdiction

unreasonable.") (emphasis in original). These considerations include: "the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies." *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174 (quoting *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. 559). Only in "rare cases [do the] minimum requirements inherent in the concept of fair play and substantial justice ... defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities." *Asahi Metal Industry Co., Ltd. v. Superior Court of Cal., Solano County,* 480 U.S. 102, 116, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (internal quotation marks omitted); *Decker,* 49 F.Supp.2d at 746–47.

Defendants have failed to offer a "compelling" reason why asserting personal jurisdiction over them would offend traditional notions of fair play and substantial justice. Defendants offer two arguments in this regard. They first argue that requiring them to defend this lawsuit in New Jersey would impose a "significant burden" as "they reside in Louisiana and do not have any office or agent in New Jersey." (Def.s' Br. at 19). However, this argument reflects a misunderstanding of the nature of the defendants' burden at his stage in the analysis. The issue is not simply whether being brought to suit in this forum will be difficult or inconvenient. After all, having to defend oneself in a foreign jurisdiction will almost always entail some measure of inconvenience. Rather, this factor only becomes meaningful where defendants can demonstrate some "special or unusual burden." *Sawtelle,* 70 F.3d at 1395; *see also Burger*

*King*, 471 U.S. at 478, 105 S.Ct. 2174 (observing that, when considering the burden on the defendant, the relevant question is whether the exercise of jurisdiction will make the litigation "so gravely difficult or inconvenient" that a party unfairly is at a 'severe disadvantage' in comparison to his opponent.") (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 18, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)).

None of the defendants has made any meaningful attempt to demonstrate that defending against Hill's third party claims in New Jersey would impose such a burden. To the contrary, the record demonstrates that defendants have been able to endure the burden of traveling to this state without "grave" difficulty. Both Clegg and McNutt have sought and received permission to appear before this Court *pro hac vice* and have previously traveled to this state in their respective roles as counsel to Wartsila in the underlying litigation. Moreover, as the Court has previously noted, attorneys from the Chaffe law firm have often traveled to New Jersey to consult with their clients here in this state. *See Sawtelle*, 70 F.3d at 1395 ("When, as here, law firm regularly represents clients outside its home state, ... the burden [of defending against a lawsuit in a foreign jurisdiction] is neither special or unusual."). Accordingly, the Court is not persuaded that the mere inconvenience of requiring the defendants to litigate Hill's third party claims in this forum militates against asserting personal jurisdiction over them.

Defendants only other argument is that New Jersey has a comparatively minor interest in adjudicating the present dispute because most, if not all, of the acts which gave rise to Hill's third party claims occurred in Louisiana and North Carolina. However, while it may be true that other forum states have a more direct and compelling interest in this litigation, because

Wartsila has decided to pursue its underlying claims against Hill in the courts of this state, both the "interests of interstate judicial economy" and Hill's interest in obtaining "convenient and effective relief" would best be served by litigating Wartsila's underlying claims and Hill's related third party claims in a single proceeding. *See Rodin Properties–Shore Mall v. Cushman & Wakefield of Pennsylvania, Inc.*, 49 F.Supp.2d 709, 718 (D.N.J.1999) (Brotman, J.) (concluding that "a complete resolution of this dispute which includes all involved parties [including all third party defendants] is in the best interest of the interstate judicial system as well as all of the individuals and entities involved."). Accordingly, the Court concludes that Defendants have failed to demonstrate that a consideration of the various "fairness factors" identified in *Burger King* suffices to overcome the strong presumption in favor of exercising jurisdiction.

## V. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss for lack of personal jurisdiction will be denied. The Court will issue an appropriate order.

**ORDER DENYING THE MOTION BY THIRD–PARTY DEFENDANTS JOHN H. CLEGG, ESQ., DAPHNE MCNUTT, ESQ., AND CHAFFE, MCCALL, PHILLIPS, TOLER & SARPY LLP., TO DISMISS DEFENDANT/THIRD–PARTY PLAINTIFF HILL INTERNATIONAL, INC.'S THIRD PARTY COMPLAINT FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(2)**

**THIS MATTER** having come before the Court on a motion by Third–Party Defendants John H. Clegg, Esq., Daphne McNutt, Esq., and Chaffe, McCall, Phillips, Toler & Sarpy, LLP, to dismiss De-

fendant/Third–Party Plaintiff Hill International, Inc.'s third party complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2);

The Court having considered the submissions of the parties; and

For the reasons set forth in the Court's opinion of this date;

**IT IS** on this 18th day of June, 2003, HEREBY

**ORDERED** that the motion filed on behalf of Third Party Defendants John H. Clegg, Daphne McNutt, Esq., and Chaffe, McCall, Phillips Toler & Sarpy to dismiss Defendant/Third Party Plaintiff Hill International, Inc.'s Third Party Complaint based on a lack of personal jurisdiction is **DENIED.**

No costs.