**WÄRTSILÄ NSD NORTH AMERICA, INC., Plaintiff,**

v.

**HILL INTERNATIONAL, INC., Defendant/Third–Party Plaintiff,**

v.

**John H. Clegg, Esquire, Daphne McNutt, Esquire, and Chaffe, McCall, Phillips, Toler & Sarpy, L.L.P. Third–Party Defendants.**

**No. CIV.A. 99–4565 SSB.**

United States District Court, D. New Jersey.

March 30, 2004.

Michael Ochs Adelman, Esq., Drinker Biddle & Shanley LLP, Florham Park, NJ, for Plaintiff Wärtsilä NSD North America Inc.

Jane Ward Voegele, Esq., Dechert, Price & Rhoads, Princeton, NJ, for Defendant/Third–Party Plaintiff Hill International, Inc.

Marianne Johnston, Esq., Stradley, Ronon, Stevens & Young, Woodland Falls Corporate Park, Cherry Hill, NJ, for Third–Party Defendants John H. Clegg, Esq., Daphne McNutt, Esq., and Chaffe, McCall, Phillips, Toler & Sarpy LLP.

## OPINION REGARDING DEFENDANT'S MOTION FOR RULE 11 SANCTIONS

BROTMAN, District Judge.

Presently before the Court is a motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure filed by Defendant Hill International Inc. ("Hill"). For the reasons discussed below, Defen-

dant's motion will be denied. As the prevailing party, the Plaintiff will be awarded the reasonable expenses and attorney's fees incurred in opposing Hill's motion, pursuant to Rule 11(c)(1)(A).

## I. INTRODUCTION

This litigation arises out of a business relationship between Wärtsilä Diesel, an engineering and construction company and the predecessor to Plaintiff Wärtsilä NSD North America, Inc ("Wärtsilä"), and Hill International, construction consulting firm in the business of providing expert advice and project management for major construction projects. Richard LeFebvre, one of Hill's "expert" employees, was assigned to the Wärtsilä project, first as a Hill employee but later as an independent contractor on the Wärtsilä payroll. As it would turn out, LeFebvre lacked the credentials claimed in his resume. Namely, he did not hold either the engineering degrees or the professional certifications represented. Wärtsilä's complaint alleges that the late discovery of these defects in LeFebvre's resume ultimately caused the company to lose millions of dollars in arbitration claims and related litigation.

Hill has brought the present motion for Rule 11 sanctions contending that two crucial allegations in Wärtsilä's Complaint are "completely false" and were submitted with knowledge of their falsity: (1) "That Hill intentionally gave plaintiff a false resume for LeFebvre;" and, (2) that "plaintiff relied on incorrect information in Richard LeFebvre's resume concerning his college degrees when plaintiff entered into the January 1995 consulting agreement." According to Hill, information gleaned from the deposition of Kevin Curran, a Wärtsilä manager who had previously known LeFebvre, "indisputably" demonstrates the falsity of the allegations contained in Wärtsilä's complaint.

Moreover, Hill asserts that Wärtsilä's negligence claim is without evidentiary foundation. For Wärtsilä's reluctance to withdraw its claims against Hill in the face of this evidence, or the lack thereof, Hill seeks (among other things) to strike the relevant allegations by way of a Rule 11 sanction, an action that would lead inevitably to a dismissal of all remaining claims against it.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In July 1994, Wärtsilä entered into a contract with Coastal Salvadorian Ltd. ("Coastal") wherein Wärtsilä agreed to design, engineer, procure, construct, start up and test a diesel engine power plant in Nejapa, El Salvador ("the Project"). Wärtsilä, whose business had up to that point focused primarily on the sale and maintenance of diesel engines, in turn subcontracted much of the plant's construction to a variety of other entities, including Black & Veatch International ("BVT"). Within a matter of months, the Project fell behind schedule, resulting in numerous contractual disputes between Wärtsilä, BVI, and Coastal. In an effort to get the project back on track, Wärtsilä sought the services of the Defendant, Hill International.

According to Wärtsilä's first amended complaint, Hill submitted a proposal for the consulting position on January 18, 1995. (Pl.'s First Amended Compl. at ¶ 31.) In its proposal, Hill recommended that Richard LeFebvre, one of the firm's senior consultants, be assigned to the Project to "collect, organize and evaluate ... factual information and report ... his findings as to the best way to proceed with the completion of the project." (Id. at ¶ 33.) LeFebvre's responsibilities were to include gathering information and materials related to the construction project, visiting the

project site "to evaluate the adequacy of the plans and specifications," and comparing the actual performance of the construction work to Wärtsilä's obligations under its contract with Coastal. (*Id.*) Attached to the proposal was a copy of LeFebvre's professional resume which represented that he: (a) had received a B.S. in electrical engineering from Penn State in 1966; (b) had earned a B.A. in business administration from Duquesne University in 1969; (c) had taken courses in business law at the University of North Florida in 1983; and (d) was registered and licensed as a professional engineer in Pennsylvania, New York, and Massachusetts. (*Id.* at ¶ 32.)

On January 24, 1995, Wärtsilä and Hill International entered into a written consulting agreement that incorporated by reference the January 18 proposal. (*Id.* at ¶ 34.) Pursuant to the terms of the agreement, Hill assigned Richard LeFebvre to work as a senior consultant on the Project. (*Id.* at ¶ 35.) LeFebvre was quickly promoted by Wärtsilä to the position of Project Manager and continued to work on the Project as a Hill employee until May 25, 1995. (*Id.* at ¶¶ 37, 40.) Among his responsibilities was the task of analyzing issues bearing on potential claims and defenses in contractual disputes between Wärtsilä and BVI. (*Id.* at ¶¶ 38–39.)

On June 1, 1995, with Hill's approval, Wärtsilä hired LeFebvre "as an independent contractor to provide assistance with construction and claims management on the Project." (*Id.* at ¶ 41.) Allegedly acting in reliance on LeFebvre's analysis and recommendations, Wärtsilä in May 1996 decided to pursue claims against BVI before the American Arbitration Association and retained the Louisiana law firm of Chaffe, McCall, Phillips, Toler & Sarpy, L.L.P., and two of its attorneys, John H. Clegg, Esq., and Daphne McNutt, Esq., to

initiate arbitration proceedings against BVI in Charlotte, North Carolina. (*Id.* at ¶ 43; Third Party Complaint at ¶ 11.) LeFebvre was considered a "key witness" in the proceedings due to his intimate and extensive knowledge of the facts underlying the points of contention between the two parties and his participation in the drafting of various "claim support" documents. (Pl.'s First Amended Compl. at ¶¶ 43–44.)

At the arbitration proceedings in September 1997, LeFebvre offered testimony regarding the academic and professional credentials listed on his resume. (*Id.* at ¶ 47.) On September 8, 1997, toward the end of his direct testimony, Wärtsilä became aware, "for the first time," that there were questions concerning LeFebvre's educational and professional credentials when counsel for BVI requested that LeFebvre execute a release for background academic information. (*Id.* at ¶ 48.) Later that day, after the proceedings had been adjourned, LeFebvre admitted to Wärtsilä's attorneys that the statements on his resume concerning a business degree from Duquesne University were not accurate. (*Id.* at ¶ 49.) He allegedly told Wärtsilä that Hill had asked him to overstate the extent of his training at Duquesne. (*Id.*)

The next morning, LeFebvre requested and received from Hill a revised resume which omitted any reference to a business degree from Duquesne or business law courses at North Florida and modified the date on which he claimed to have received an electrical engineering degree from Penn State. (*Id.* at ¶ 50.) When the proceedings resumed later that day, BVI's attorneys subjected LeFebvre to a vigorous cross-examination, forcing him to acknowledge the obvious inconsistencies between the two resumes. LeFebvre nevertheless insist-

ed that the revised resume was entirely accurate and truthful. (*Id.* at ¶ 50(b).) However, by the conclusion of the day's proceedings, Wärtsilä's attorneys were forced to concede that a hasty investigation into LeFebvre's academic credentials had uncovered no evidence that he had ever received an engineering degree from Penn State or attended any of the other schools listed on his resume. (*Id.* at ¶ 51.) Wärtsilä also found no evidence that LeFebvre had ever been licensed as a professional engineer in either New York, Pennsylvania, or Massachusetts. (*Id.*)

In light of LeFebvre's perjury, Wärtsilä's counsel withdrew his testimony, and the arbitration panel granted Wärtsilä a short recess to restructure its case based on new witnesses. (*Id.* at ¶ 53.) During that time, the company re-examined materials prepared by LeFebvre and allegedly discovered that he had improperly altered original "claim support" documents. (*Id.* at ¶ 53.) Consequently, Wärtsilä claims it was forced to withdraw certain claims. (*Id.*) On March 5, 1998, the arbitration panel issued a judgment of $4.65 million in favor of BVI. Wärtsilä attributes the arbitration award to the complete loss of credibility it allegedly suffered as a result of LeFebvre's blatant misrepresentations, both on his resume and in his testimony before the arbitration panel. (*Id.* at ¶ 52.)

In November 1997, shortly after LeFebvre was exposed as a fraud and a perjurer, BVI brought claims in tort and contract against Wärtsilä in the United States District Court for the District of Kansas ("Kansas litigation"). (*Id.* at ¶ 58, 60.) The lawsuit was based on Wärtsilä's "placement of an individual lacking in the necessary education, skills, professional licenses and trustworthiness as Project Manager charged with oversight of BVI's work." (*Id.* at ¶ 59.) Wärtsilä ultimately settled this dispute with BVI for $850,000. Wärtsilä subsequently initiated the present litigation against Hill in the United States District Court for the District of New Jersey.[1]

Wärtsilä's Original Complaint asserted claims for negligence (count I), fraud (count II), consumer fraud (count III), and breach of contract (count IV). On September 29, 2000, the Court dismissed Counts I (negligence) and III (consumer fraud) for failure to state a claim on which relief may be granted. *Wärtsilä NSD North America, Inc. v. Hill Int'l, Inc.*, No. 99–4565 (D.N.J. Sept. 29, 2000). However, the negligence claim was later reinstated.

On reconsideration, the Court found that the negligence claim could prevail under a theory of negligent hiring contingent on the existence of certain facts; for instance, if the Plaintiff could prove that LeFebvre altered Wärtsilä claims support documents while he was still under the direct employ of Hill International. The Court also reconsidered but rejected the viability of the

---

1. Wärtsilä initially retained attorneys Clegg and McNutt, who had left the Chaffe firm to join the New Orleans law firm of McGlinchey Stafford, LLC, to represent it in this suit. However, Clegg and McNutt have since been added as Third Party Defendants in this case and thus they are no longer representing Wärtsilä. Hill filed the Third Party Complaint in August of 2001, asserting claims for contribution and indemnification against Clegg, McNutt, and the Chaffe law firm. Hill's complaint alleges that, as counsel for Wärtsilä during the BVI arbitration proceedings, Third Party Defendants acted recklessly and negligently and that it was their failure to provide Wärtsilä with "adequate legal representation" which caused the losses Wärtsilä allegedly sustained in both the BVI arbitration and the Kansas litigation. *See generally Wartsila v. Hill International, Inc.*, 269 F.Supp.2d 547 (D.N.J.2003) (denying third party defendants' motion to dismiss for lack of personal jurisdiction).

claim under a theory of negligent misrepresentation. Applying § 552 of the Restatement (Second) of Torts, it found that the theory must fail because the "Restatement makes clear that liability attaches only when the defendant has a pecuniary interest in the transaction in which the information is given" and Wärtsilä's Original Complaint offered "no indication that Hill had a pecuniary interest in the arbitration hearing for which the updated resume was provided." *Wärtsilä NSD North America, Inc. v. Hill Int'l, Inc.*, No. 99–4565, slip op. at 8 (D.N.J. June 27, 2001). Yet the Court left open the possibility that this defect in the pleadings could be (and had been) cured.

By the time of the motion for reconsideration, Wärtsilä's Original Complaint had been superceded by a First Amended Complaint. Although the Court briefly mentioned the amendments in its opinion, the scope of reconsideration was necessarily limited to the pleadings before the Court at the time of the underlying opinion on dismissal. The Court noted that "Plaintiff has amended its Complaint to allege that after Wärtsilä hired LeFebvre directly, LeFebvre remained employed by Hill on other matters through the time of the arbitration hearing" but declined to "consider the allegation because it was not in the record before the Court at the time of the motion to dismiss." *Wärtsilä* slip op. at 9 n. 1 (D.N.J. June 27, 2001).

As it now stands, Wärtsilä's First Amended Complaint asserts claims for negligence, fraud, and breach of contract and seeks recovery of both compensatory and punitive damages for the harm allegedly suffered as a result of the misrepresentations concerning LeFebvre's academic and professional credentials. It has never been directly challenged—either by filing a second motion to dismiss or a motion for summary judgment. Instead,

Hill's only response to the First Amended Complaint has been to submit the present motion, seeking to dismiss the claims by way of Rule 11 sanctions.

## III. THE RULE 11 STANDARD

Federal Rule of Civil Procedure 11 has undergone many significant revisions since it was first adopted in 1937. *See Hockley v. Shan Enterprises*, 19 F.Supp.2d 235 (D.N.J.1998) (Brotman, J.) (discussing the history of the rule, up through the 1993 amendments). In its latest incarnation, Rule 11 provides that by submitting a "pleading, written motion, or other paper" to the court, a person is certifying, among other things, that to the best their knowledge the legal arguments contained therein are supported by a existing law, or a non-frivolous argument for extension, modification or reversal and that the facts contained therein are supported by existing evidence or are likely to be supported after reasonable inquiry. FED. R. CIV. P. 11(b). Despite progressive amendments to the Rule, the basic duty imposed remains largely unchanged. Put simply, Rule 11 requires a person contemplating filing a paper with the court to "stop, think, and investigate" before doing so. In appropriate circumstances, the Rule allows for a litigant to seek sanctions for a violation of the standards found in subsection (b). However, such a motion should not be sought reflexively or as a matter of course.

The imposition of Rule 11 sanctions is properly reserved for exceptional circumstances, *Teamsters Local Union No. 430 v. Cement Express Inc.*, 841 F.2d 66, 68 (3d Cir.1988), and motions "should not be made or threatened for minor, inconsequential violations" of the standards. FED. R. CIV. P. 11, Advisory Committee Notes (1993 amendments). Perhaps even more important than when a party decides to deploy a Rule 11 motion is the way in

which it was used. "A motion should not be employed as a discovery device or to test the legal sufficiency or efficacy of allegations in the pleadings; other motions are available for those purposes." *Id.; CTC Imports and Exports v. Nigerian Petroleum Corp.*, 951 F.2d 573, 579 (3d Cir.1991) ("In imposing Rule 11 sanction ... the court does not pass judgment on the merits of an action.") (citing *Gaiardo v. Ethyl Corp.*, 835 F.2d 479 (3d Cir.1987)); 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1336 (2003 Supp.) ("Even in its amended form, Rule 11 should not be used to raise issues of legal sufficiency that more properly can be disposed of by ... a motion for summary judgment."); *see also Gaiardo*, 835 F.2d at 482 ("Rule [11] must not be used as an automatic penalty against an attorney or a party advocating the losing side of a dispute."). Even if a Rule 11 motion is ultimately denied, the moving party may be effectively rewarded if the motion is allowed to lead the Court into a searching evaluation of the merits of a case.

## IV. DISCUSSION

In the present motion, Hill attacks two explicit allegations made in Wärtsilä's Amended Complaint and one "implied allegation" supposedly raised by Wärtsilä's continued assertion of the negligence claim against Hill: (1) "That Hill intentionally gave plaintiff a false resume for Le-Febvre;" (2) that "plaintiff relied on incorrect information in Richard LeFebvre's resume concerning his college degrees when plaintiff entered into the January 1995 consulting agreement;" and (3) that Le-Febvre altered claim support documents while directly employed by Hill International. According to Hill, there is a complete lack of proof that Hill knew of the fabrications in LeFebvre's resume when it was provided to Wärtsilä. Moreover, Hill

contends that the deposition testimony of Kevin Curran, a Wärtsilä manager intricately involved in the Najepa Project, conclusively establishes a lack of reliance on LeFebvre's credentials. For Wärtsilä's decision to maintain its claims for fraud and breach of contract without such evidence, Hill seeks sanctions in the form of a dismissal of those claims. Finally, Hill asserts that an "implied allegation" that LeFebvre altered certain claim support document is entirely unsupported by the evidence. For maintaining the negligence claim without evidence of alterations, Hill seeks sanctions in the form of a dismissal of that claim. Thus, if Hill's Rule 11 motion were granted in its entirety, the case against it would be dismissed.

■ With regard to the fraud claim, Wärtsilä admits in its reply brief that there is no "smoking gun" conclusively establishing Hill's knowledge that the resume was fabricated. However, Wärtsilä has pointed to myriad circumstantial evidence that would suggest that Hill "knew or should have known" of the falsity of the LeFebvre resume, not the least of which are Hill's provision of a second "corrected" resume and the admission by Hill principal Irvin Richter that the company did not follow its own procedures with regard to LeFebvre's resume. (Deposition of Irvin Richter at 62.) Without undertaking a detailed examination of the sufficiency of the proffered evidence, as might be appropriate on a motion for summary judgment, it is enough to note here that Wärtsilä has established that this allegation is far from patently frivolous. Although Wärtsilä may face difficulty establishing the requisite knowledge on the part of Hill, "[t]o say that a party confronts difficult questions of factual sufficiency is not the same as saying its claims are patently frivolous." *Ford Motor Company v. Summit Motor Products, Inc.*, 930 F.2d 277, 290 (3d Cir.

1991). It is in the nature of fraud cases that the scienter element will ordinarily be difficult to establish. This does not make the pressing of the claim itself a sanctionable activity.

As to the question of reliance, Hill has submitted the deposition testimony of Kevin Curran. According to Hill, Curran is a central figure in the decision to retain the services of Hill International and Richard LeFebvre. He is the person responsible for contacting Hill, receiving Hill's proposal, and signing the contract between Wärtsilä and Hill. In his deposition, Curran testified that he never relied on LeFebvre's resume in hiring him, that he was not looking for an individual with a college degree or professional engineer's license, and that he knew LeFebvre had no college degrees. (Deposition of Kevin Curran at 20–21, 28, 69–71, 102–03.) Curran further testified that he would have retained LeFebvre's services regardless of his employer. As it turned out, LeFebvre was employed by Hill at the time.

Hill claims that Curran's testimony irrefutably proves that there was no reliance on the representations that LeFebvre was a college graduate with numerous professional certifications, and hence no reliance on the resumes provided by Hill. But Hill's assertion is in fact refuted by the depositions of other key players in the decision to retain LeFebvre, most notably that of Wärtsilä General Counsel John Weisse. Weisse testified that he was approached early on by Curran, who asked for his assistance in convincing the Wärtsilä President and other Wärtsilä managers that the company should hire a claims consultant to protect itself in the likely event of litigation. (Deposition of John Weisse at 55–57.) If management could be convinced, Curran allegedly asked Weisse to "help [Curran] figure out whether we got the right guys." (*Id.* at 57.) Weisse was also present at the January 1995 meeting between Curran, LeFebvre and Bill Lowe, a representative of Hill International, at which time the LeFebvre resume was first provided. Without assessing the sufficiency of the proffered evidence for support of Wärtsilä's claims-which would only be appropriate on a motion for summary judgment—the Court notes that the proffered evidence clearly establishes that Wärtsilä's fraud claim is not patently frivolous.

Moreover, Curran's own testimony falls far short of conclusively demonstrating a lack of reliance on the part of Wärtsilä. By his own admission, Curran only reached the realization that LeFebvre lacked the credentials listed in his resume sometime around November of 2001, long after the decision to hire LeFebvre had been made, after this litigation was initiated, and even after Wärtsilä's Amended Complaint had been filed with the Court. (Curran Dep. at 104–06.) In fact, Curran testified that the discovery of LeFebvre's fabricated credentials after the collapse of the BVI arbitration took him as a "big shock." (*Id.* at 105.) Leaving aside the inconsistency of Curran's recollection and the conflicting inferences that can be drawn from his deposition testimony, it is clear that Curran's late acquired recollection is of no moment to the question of reliance at the time when decisions regarding LeFebvre's employment were being made. Hill's proffer of this testimony for the present purposes is entirely misplaced.

Finally, with regard to the negligence claim Hill points to Wärtsilä's December 28, 2001, response to interrogatories, indicating that Wärtsilä had no evidence of any alterations in claim support documents made during the time LeFebvre was under the direct employ of Hill International. (*See* Response No. 7 of Plaintiffs Responses to Defendant's for Production of Documents). Wärtsilä responds that evidence

of alterations was since discovered and provided to Hill. However, even if such evidence had not been forthcoming, Hill's reliance on this point as a basis for sanctions would still be entirely untenable. In drawing all reasonable inferences in Defendant's favor, this Court's June 27, 2001 Opinion on Reconsideration of its earlier Opinion on 12(b)6 dismissal merely cited one possible way in which Wärtsilä could sustain its claim under a theory of negligent hiring. It did not convert alterations of documents into an evidentiary prerequisite, as Hill now seems to claim. Moreover, the Court's Opinion clearly avoided decision on the viability of Wärtsilä's claim under a theory of negligent misrepresentation pursuant to the Amended Complaint. As with the other points of the present motion, this issue is more appropriately addressed in a substantive motion on the merits and not through a collateral motion for sanctions. For now, the Court finds only that Wärtsilä's pursuit of a negligence claim, with or without evidence of claims alteration, is not by any stretch patently frivolous or sanctionable activity.

## V. CONCLUSION

Nine months have now passed since Hill submitted this motion. It has been a year and a half since Hill took Mr. Curran's deposition and 'discovered' the alleged misrepresentations in Wärtsilä's Complaint. This case as a whole has consumed nearly five years of litigation with no trial yet in sight. In these circumstances it is difficult, if not impossible, to understand why a motion for summary judgment was not forthcoming from the Defendant, if—as Hill here asserts—it felt that Wärtsilä's complaint is legally insufficient in light of Mr. Curran's statements. Since it was not forthcoming, the Court is extremely reluctant to review the legal sufficiency of Wärtsilä's complaint on a Rule 11 motion.

Such analysis is properly reserved for a motion on the merits.

For the foregoing reasons the Defendants motion for Rule 11 sanctions will be denied. Furthermore, because the Court at various points above finds that the allegations in the present motion are untenable, misplaced, inappropriate for a Rule 11 motion, or simply inexplicable in light of the much more stringent test of the Plaintiff's proofs that is available through a motion for summary judgment, the Plaintiff will be awarded the costs associated with responding to this motion as the prevailing party under Rule 11(c)(1)(A). Rule 11 sanctions are properly deployed only in exceptional circumstances, this is not such a circumstance.