WÄRTSILÄ NSD NORTH AMERICA, INC., Plaintiff,

v.

HILL INTERNATIONAL, INC., Defendant/Third–Party Plaintiff,

v.

John H. Clegg, Esquire, Daphne McNutt, Esquire, and Chaffe, McCall, Phillips, Toler & Sarpy, L.L.P., Third–Party Defendants.

Civil Action No. 99–4565(SSB).

United States District Court, D. New Jersey.

Oct. 29, 2004.

Richard Brennan, Esq., Michael Ochs Adelman, Esq., Drinker Biddle & Shanley LLP, Florham Park, NJ, for Plaintiff Wärtsilä NSD North America Inc.

David L. Braverman, Esq., M. Frances Ryan, Esq., Dechert, Price & Rhoads, Princeton, NJ, William H. Dengler, Esq.,

Marlton, NJ, David L. Richter, Esq., for Defendant Hill International, Inc.

## OPINION REGARDING DEFENDANT HILL INTERNATIONAL'S MOTION FOR SUMMARY JUDGMENT

BROTMAN, District Judge.

Defendant Hill International Incorporated ("Hill") is a construction consulting firm in the business of providing expert advice and project management for major construction projects. Plaintiff Wärtsilä NSD North America, Inc ("Wärtsilä") is an engineering and construction company. Presently before the Court is Hill's motion seeking summary judgment as to the remaining claims in the Amended Complaint: negligence, fraud, and breach of contract. This litigation arises out of a business relationship between Wärtsilä Diesel, an engineering and construction company and the predecessor to Plaintiff, and Hill. Richard LeFebvre ("LeFebvre"), one of Hill's "expert" employees, was assigned to the Wärtsilä project, first as a Hill employee but later as an independent contractor on Wärtsilä's payroll. The parties later discovered that LeFebvre lacked the credentials claimed in his resume, as he did not hold either the engineering degrees or the professional certifications represented. Wärtsilä's Complaint alleges that the late discovery of these defects in LeFebvre's resume ultimately caused Wärtsilä to lose millions of dollars in arbitration claims and related litigation. The Court held oral argument on October 20, 2004.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

In July 1994, Wärtsilä entered into a contract with Coastal Salvadorian Ltd. ("Coastal") wherein Wärtsilä agreed to design, engineer, procure, construct, start up and test a diesel engine power plant in Nejapa, El Salvador ("the Project").

Wärtsilä's business had focused primarily on the sale and maintenance of diesel engines, so it subcontracted much of the plant's construction to a variety of other entities, including Black & Veatch International ("BVI"). Within months, the Project fell behind schedule, resulting in numerous contractual disputes between Wärtsilä, BVI, and Coastal. (Pl. First Am. Compl. ¶ 6.) In an effort to get the project back on track, Wärtsilä sought the services of the Defendant, Hill International. (Id. ¶¶ 10, 34.)

According to Wärtsilä's First Amended Complaint, Hill submitted a proposal for the consulting position on January 18, 1995. (Id. ¶ 31.) In its proposal, Hill recommended that Richard LeFebvre ("LeFebvre"), one of the firm's senior consultants, be assigned to the Project to "collect, organize and evaluate ... factual information and report ... his findings as to the best way to proceed with the completion of the project." (Id. ¶ 33.) LeFebvre's responsibilities would include gathering information and materials related to the construction project, visiting the project site "to evaluate the adequacy of the plans and specifications," and comparing the actual performance of the construction work to Wärtsilä's obligations under its contract with Coastal. (Id.) Hill attached a copy of LeFebvre's professional resume to the proposal which represented that he had: (a) received a B.S. in electrical engineering from Penn State in 1966; (b) earned a B.A. in business administration from Duquesne University in 1969; (c) taken courses in business law at the University of North Florida in 1983; and (d) registered and was licensed as a professional engineer in Pennsylvania, New York, and Massachusetts. (Id. ¶ 32.)

---

**1.** The Court compliments both parties on their presentations at oral argument.

On January 24, 1995, Wärtsilä and Hill entered into a written consulting agreement (the "agreement") that incorporated by reference the January 18 proposal. (*Id.* ¶ 34.) Pursuant to the terms of the agreement, Hill assigned Richard Le-Febvre to work as a senior consultant on the Project. (*Id.* ¶ 35.) As part of his responsibilities, LeFebvre analyzed issues bearing on potential claims and defenses in contractual disputes between Wärtsilä and BVI. (*Id.* ¶¶ 38, 39.) LeFebvre was quickly promoted by Wärtsilä to the position of Project Manager and continued to work on the Project as a Hill employee until May 25, 1995. (*Id.* ¶¶ 37, 40.)

On June 1, 1995, with Hill's approval, Wärtsilä hired LeFebvre "as an independent contractor to provide assistance with construction and claims management on the Project." (*Id.* ¶ 41.) Relying on Le-Febvre's analysis and recommendations, Wärtsilä decided in May 1996 to pursue claims against BVI before the American Arbitration Association and retained the Louisiana law firm of Chaffe, McCall, Phillips, Toler & Sarpy, L.L.P., and two of its attorneys, John H. Clegg, Esq., and Daphne McNutt, Esq., to initiate arbitration proceedings against BVI in Charlotte, North Carolina. (*Id.* ¶ 43; Third Party Compl. ¶ 11.) Due to his intimate and extensive knowledge of the facts underlying the dispute as well as his participation in drafting various "claim support" documents LeFebvre was considered a "key witness" in the proceedings. (Pl.'s First Am. Compl. ¶¶ 43–44.)

At the arbitration proceedings in September 1997, LeFebvre offered testimony regarding the academic and professional credentials listed on his resume. (*Id.* ¶ 47.) On September 8, 1997, counsel for BVI, toward the end of LeFebvre's direct testimony, requested that LeFebvre execute a release for his background academic information. (*Id.* ¶ 48.) Wärtsilä became aware, "for the first time," that there were questions concerning LeFebvre's educational and professional credentials. (*Id.*) Later that day, after the proceedings had been adjourned, LeFebvre admitted to Wärtsilä's attorneys that the statement on his resume concerning the business degree from Duquesne University was not accurate. (*Id.* ¶ 49.) He allegedly told Wärtsilä that Hill had asked him to overstate the extent of his training at Duquesne. (*Id.*)

The next morning, LeFebvre requested and received from Hill a revised resume. This one omitted any reference to a business degree from Duquesne or business law courses at North Florida and modified the date on which he claimed to have received an electrical engineering degree from Penn State.. (*Id.* ¶ 50.) When the proceedings resumed later that day, BVI's attorneys subjected LeFebvre to a vigorous cross-examination, forcing him to acknowledge the obvious inconsistencies between the two resumes. LeFebvre nevertheless insisted that the revised resume was entirely accurate and truthful. (*Id.* ¶ 50(b).) However, by the conclusion of the day's proceedings, Wärtsilä's attorneys were forced to concede that a hasty investigation into LeFebvre's academic credentials had uncovered no evidence that he had ever received an engineering degree from Penn State or attended any of the other schools listed on his resume. (*Id.* ¶ 51.) Wärtsilä also found no evidence that LeFebvre had ever been licensed as a professional engineer in either New York, Pennsylvania, or Massachusetts. (*Id.*)

In light of this development, Wärtsilä's counsel withdrew LeFebvre's testimony and the arbitration panel granted Wärtsilä a short recess to restructure its case based on new witnesses. (*Id.* ¶ 53.) During that time, Wärtsilä re-examined materials pre-

pared by LeFebvre and discovered that he had improperly altered original "claim support" documents. (*Id.* ¶ 53.) Consequently, Wärtsilä says it was forced to withdraw certain claims then before the panel. (*Id.*) On March 5, 1998, the arbitration panel issued a judgment in BVI's favor for $4.65 million. Wärtsilä attributes the award to the complete loss of credibility it allegedly suffered as a result of LeFebvre's misrepresentations, both on his resume and in his testimony before the arbitration panel. (*Id.* ¶ 52.)

In November 1997, shortly after LeFebvre's perjury was exposed, BVI brought claims in tort and contract against Wärtsilä in the United States District Court for the District of Kansas ("Kansas litigation"). (*Id.* ¶ 58, 60.) The lawsuit was based on Wärtsilä's "placement of an individual lacking in the necessary education, skills, professional licenses and trustworthiness as Project Manager charged with oversight of BVI's work." (*Id.* ¶ 59.) Wärtsilä ultimately settled this dispute with BVI for $850,000. It also

subsequently initiated the present litigation against Hill in the United States District Court for the District of New Jersey.

Wärtsilä's Original Complaint asserted claims for Negligence (Count I), Fraud (Count II), Consumer Fraud (Count III), and Breach of Contract (Count IV). On September 29, 2000, the Court dismissed Counts I (Negligence) and III (Consumer Fraud) for failure to state a claim on which relief may be granted.[2] *Wärtsilä NSD North America, Inc. v. Hill Int'l, Inc.*, No. 99–4565 (D.N.J. September, 2000)(unpublished disposition). However, the negligence claim was later reinstated.[3] Presently, Wärtsilä's First Amended Complaint asserts claims for negligence, fraud, and breach of contract. Wärtsilä, therefore, seeks recovery of both compensatory and punitive damages for the harm resulting from Hill's misrepresentations of LeFebvre's academic and professional credentials.

On August 8, 2002, Third Party Defendants entered their first response to Hill's

---

**2.** With the exception of Wärtsilä's breach of contract claim, over which Maryland law is applied, the Court found that New Jersey law governs the claims. *Wärtsilä NSD North America, Inc. v. Hill Int'l, Inc.*, No. 99–4565 (D.N.J. Sept. 29, 2000)(unpublished disposition).

**3.** On reconsideration, the Court found that the negligence claim could prevail under a theory of negligent hiring contingent on the existence of certain facts; for instance, if the Plaintiff could prove that LeFebvre altered Wärtsilä claims support documents while he was still under the direct employ of Hill International. The Court also reconsidered but rejected the viability of the claim under a theory of negligent misrepresentation. Applying § 552 of the Restatement (Second) of Torts, it found that the theory must fail because the "Restatement makes clear that liability attaches only when the defendant has a pecuniary interest in the transaction in which the information is given" and Wärtsilä's Original Complaint offered "no indication that

Hill had a pecuniary interest in the arbitration hearing for which the updated resume was allegedly provided." *Wärtsilä NSD North America, Inc. v. Hill Int'l, Inc.*, No. 99–4565, slip op. at 8 (D.N.J. June 27, 2001). Yet, the Court left open the possibility that this defect in the pleadings could be (and had been) cured.

By the time of the motion for reconsideration, Wärtsilä's Original Complaint had been superceded by a First Amended Complaint. Although the Court briefly mentioned the amendments in its Opinion, the scope of reconsideration was necessarily limited to the pleadings before the Court at the time of the underlying opinion on dismissal. The Court noted that "Plaintiff has amended its Complaint to allege that after Wärtsilä hired LeFebvre directly, LeFebvre remained employed by Hill on other matters through the time of the arbitration hearing" but declined to "consider the allegation because it was not in the record before the Court at the time of the motion to dismiss." *Id.* slip op. at 9 n. 1 (D.N.J. June 27, 2001).

Complaint, challenging this Court's personal jurisdiction by filing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2). This Court denied the Third Party Defendants' motion in an Opinion issued on June 18, 2003. *See Wärtsilä NSD North America, Inc., v. Hill International, Inc.,* 269 F.Supp.2d 547 (D.N.J.2003). The Attorneys thereafter filed a motion for reconsideration, which was also denied on July 28, 2003. *Wärtsilä NSD North America, Inc., v. Hill International,* slip op. (D.N.J. July 28, 2003). Since that time, they have filed two additional motions which the Court resolved on June 22, 2004, granting the Third Party Defendants' Motion for Summary Judgment and thereby dismissing the claims against the attorneys. Thereafter, the Third Party Defendants sought certification of that determination pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. The Court denied that motion on August 18, 2004.

On May 13, 2004 Defendant Hill filed its Motion for Summary Judgment, which is the only pending motion at this time. Hill's motion attacks each of Wärtsilä's three remaining claims on the merits. First, Hill contends that the negligence claims should be dismissed because no harm was suffered during the period in which it owed a duty of care to Wärtsilä, and further that this fact is dispositive of the claim. Second, with regard to the Fraud claim, Hill contends that there is no evidence of Hill's intent to misrepresent LeFebvre's credentials or of any reliance on the part of Wärtsilä. Finally, Hill argues that the Breach of Contract claim is barred by the agreement between the parties, which specifically frees Hill from liability for consequential damages. Many of these arguments have been previously introduced to the Court, although in an entirely different posture.

## II. HILL'S MOTION FOR SANCTIONS

On March 30, 2004, this Court entered an Opinion and Order regarding Hill's Rule 11 motion, seeking sanctions against Plaintiff Wärtsilä. The contentions of the parties with respect to this motion are set forth in the Court's Opinion on this matter. *See Wärtsilä NSD v. Hill International Inc.,* 315 F.Supp.2d 623 (D.N.J.2004). On March 30, 2004, this Court entered an Opinion and Order denying the Motion. The Opinion noted that:

The imposition of Rule 11 sanctions is properly reserved for exceptional circumstances, *Teamsters Local Union No. 430 v. Cement Express Inc.,* 841 F.2d 66, 68 (3d Cir.1988), and motions "should not be made or threatened for minor, inconsequential violations" of the standards. FED.R.CIV.P. 11, Advisory Committee Notes (1993 amendments). Perhaps even more important than when a party decides to deploy a Rule 11 motion is the way in which it was used. "A motion should not be employed as a discovery device or to test the legal sufficiency or efficacy of allegations in the pleadings; other motions are available for those purposes." *Id.; CTC Imports and Exports v. Nigerian Petroleum Corp.,* 951 F.2d 573, 579 (3d Cir.1991) ("In imposing Rule 11 sanction ... the court does not pass judgment on the merits of an action.") (citing *Gaiardo v. Ethyl Corp.,* 835 F.2d 479 (3d Cir.1987)); 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1336 (2003 Supp.) ("Even in its amended form, Rule 11 should not be used to raise issues of legal sufficiency that more properly can be disposed of by ... a motion for summary judgment."); *see also Gaiardo,* 835 F.2d at 482 ("Rule [11] must not be used as an automatic penalty against an attorney or a party advocating the losing side of a

dispute."). Even if a Rule 11 motion is ultimately denied, the moving party may be effectively rewarded if the motion is allowed to lead the Court into a searching evaluation of the merits of a case. *Wärtsilä NSD v. Hill International Inc.,* 315 F.Supp.2d at 627–28. The Court found that Hill's Motion failed to demonstrate the extraordinary circumstances necessary to justify a motion for sanctions. Particularly, it concluded that the circumstances failed to warrant a Motion, such as Hill's, seeking in effect to dismiss the entire lawsuit against it by way of Rule 11 sanction. The Court further concluded that, as a matter of fee shifting discretion conferred by the Federal Rules, it was appropriate to award Wärtsilä the attorney's fees and costs incurred in response to the motion.

Thus many of the issues raised in the Motion for Summary Judgment have already been once addressed by the Court, albeit on an entirely different standard and burden of proof.[4] Therefore, although the Court's Opinion addressed the effect of the Curran Deposition and many of the same legal issues as the present motion for summary judgment, the Court was mindful at that time of the need to avoid determinations on the sufficiency of the evidence beyond the minimum threshold required by Rule 11.

With regard to the fraud claim, Wärtsilä admits in its reply brief that there is no "smoking gun" conclusively establishing

Hill's knowledge that the resume was fabricated. However, Wärtsilä has pointed to myriad circumstantial evidence that would suggest that Hill "knew or should have known" of the falsity of the LeFebvre resume, not the least of which are Hill's provision of a second "corrected" resume and the admission by Hill principal Irvin Richter that the company did not follow its own procedures with regard to LeFebvre's resume. (Deposition of Irvin Richter at 62.) Without undertaking a detailed examination of the sufficiency of the proffered evidence, as might be appropriate on a motion for summary judgment, it is enough to note here that Wärtsilä has established that this allegation is far from patently frivolous. Although Wärtsilä may face difficulty establishing the requisite knowledge on the part of Hill, "[t]o say that a party confronts difficult questions of factual sufficiency is not the same as saying its claims are patently frivolous." *Ford Motor Company v. Summit Motor Products, Inc.,* 930 F.2d 277, 290 (3d Cir.1991). It is in the nature of fraud cases that the scienter element will ordinarily be difficult to establish. This does not make the pressing of the claim itself a sanctionable activity.

As to the question of reliance, Hill has submitted the deposition testimony of Kevin Curran. According to Hill, Curran is a central figure in the decision to

---

4. "A motion should not be employed as a discovery device or to test the legal sufficiency or efficacy of allegations in the pleadings; other motions are available for those purposes." *Id.; CTC Imports and Exports v. Nigerian Petroleum Corp.,* 951 F.2d 573, 579 (3d Cir.1991) ("In imposing Rule 11 sanction ... the court does not pass judgment on the merits of an action.") (citing *Gaiardo v. Ethyl Corp.,* 835 F.2d 479 (3d Cir.1987)); 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1336 (2003 Supp.) ("Even in its amended form, Rule 11 should not be used to raise issues of legal sufficiency that more properly can be disposed of by ... a motion for summary judgment."); *see also Gaiardo,* 835 F.2d at 482 ("Rule [11] must not be used as an automatic penalty against an attorney or a party advocating the losing side of a dispute."). Even if a Rule 11 motion is ultimately denied, the moving party may be effectively rewarded if the motion is allowed to lead the Court into a searching evaluation of the merits of a case.

retain the services of Hill International and Richard LeFebvre. He is the person responsible for contacting Hill, receiving Hill's proposal, and signing the contract between Wärtsilä and Hill. In his deposition, Curran testified that he never relied on LeFebvre's resume in hiring him, that he was not looking for an individual with a college degree or professional engineer's license, and that he knew LeFebvre had no college degrees. (Deposition of Kevin Curran at 20–21, 28, 69–71, 102–03.) Curran further testified that he would have retained LeFebvre's services regardless of his employer. As it turned out, LeFebvre was employed by Hill at the time.

Hill claims that Curran's testimony irrefutably proves that there was no reliance on the representations that LeFebvre was a college graduate with numerous professional certifications, and hence no reliance on the resumes provided by Hill. But Hill's assertion is in fact refuted by the depositions of other key players in the decision to retain LeFebvre, most notably that of Wärtsilä General Counsel John Weisse. Weisse testified that he was approached early on by Curran, who asked for his assistance in convincing the Wärtsilä President and other Wärtsilä managers that the company should hire a claims consultant to protect itself in the likely event of litigation. (Deposition of John Weisse at 55–57.) If management could be convinced, Curran allegedly asked Weisse to "help [Curran] figure out whether we got the right guys." (*Id.* at 57.) Weisse was also present at the January 1995 meeting between Curran, LeFebvre and Bill Lowe, a representative of Hill International, at which time the LeFebvre resume was first provided. Without assessing the sufficiency of the proffered evidence for support of Wärtsilä's claims—which would only be appropriate on a motion for summary judgment—the Court notes that the proffered evidence clearly establishes that Wärtsilä's fraud claim is not patently frivolous.

Moreover, Curran's own testimony falls far short of conclusively demonstrating a lack of reliance on the part of Wärtsilä. By his own admission, Curran only reached the realization that LeFebvre lacked the credentials listed in his resume sometime around November of 2001, long after the decision to hire LeFebvre had been made, after this litigation was initiated, and even after Wärtsilä's Amended Complaint had been filed with the Court. (Curran Dep. at 104–06.) In fact, Curran testified that the discovery of LeFebvre's fabricated credentials after the collapse of the BVI arbitration took him as a "big shock." (*Id.* at 105.) Leaving aside the inconsistency of Curran's recollection and the conflicting inferences that can be drawn from his deposition testimony, it is clear that Curran's late acquired recollection is of no moment to the question of reliance at the time when decisions regarding LeFebvre's employment were being made. Hill's proffer of this testimony for the present purposes is entirely misplaced.

Finally, with regard to the negligence claim Hill points to Wärtsilä's December 28, 2001 response to interrogatories, indicating that Wärtsilä had no evidence of any alterations in claim support documents made during the time LeFebvre was under the direct employ of Hill International. (*See* Response No. 7 of Plaintiffs Responses to Defendant's for Production of Documents). Wärtsilä responds that evidence of alterations was since discovered and provided to Hill. However, even if such evidence had not been forthcoming, Hill's reliance on this point as a basis for sanctions would still

be entirely untenable. In drawing all reasonable inferences in Defendant's favor, this Court's June 27, 2001 Opinion on Reconsideration of its earlier Opinion on 12(b)(6) dismissal merely cited one possible way in which Wärtsilä could sustain its claim under a theory of negligent hiring. It did not convert alterations of documents into an evidentiary prerequisite, as Hill now seems to claim. Moreover, the Court's Opinion clearly avoided decision on the viability of Wärtsilä's claim under a theory of negligent misrepresentation pursuant to the Amended Complaint. As with the other points of the present motion, this issue is more appropriately addressed in a substantive motion on the merits and not through a collateral motion for sanctions. For now, the Court finds only that Wärtsilä's pursuit of a negligence claim, with or without evidence of claims alteration, is not by any stretch patently frivolous or sanctionable activity.

*Wärtsilä NSD v. Hill International Inc.*, 315 F.Supp.2d at 628–30. Thus, many of the same issues previously addressed by the Court have now returned for a second review, this time under the standards and burdens of Rule 56.

## III. SUMMARY JUDGMENT

### A. The Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the evidence contained in the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Serbin v. Bora Corp.*, 96 F.3d 66, 69 n. 2 (3d Cir.1996); FED.R.CIV.P. 56. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). In other words, the question before the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law". *Id.* at 251–52, 106 S.Ct. 2505. Moreover, judicial consideration of summary judgment motions requires that all reasonable inferences from facts placed before the court must be drawn in favor of the non-moving party. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

Once the moving party has met its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Several United States Supreme Court cases have held that a summary judgment motion should be granted unless the party opposing the motion "provides evidence 'such that a reasonable jury could return a verdict in favor of the nonmoving party.'" *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir.1996) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). To avoid summary judgment, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, the non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin*, 96 F.3d at 69 n. 2 (quoting *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548). If the evidence presented

by the nonmovant is sufficient to form the basis of a jury finding in favor of the non-moving party, summary judgment is inappropriate. On the other hand, if the nonmovant's evidence on any essential element of the claims asserted is merely "colorable" or is "not significantly probative," the court must enter summary judgment in favor of the moving party. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505; *see also Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir.1991) (observing that non-movant's effort to defeat summary judgment may not "rest upon mere allegations, general denials, or vague statements").

## B. The Arguments

The pending motion for summary judgment seeks dismissal of the remaining claims in Wärtsilä's Amended Complaint; namely the claims for negligence (Count I), fraud (Count II), and breach of contract (Count IV). The Court will address Hill's motion for summary judgment by order of claim. In so doing, the Court will more fully set forth the parties contentions in support of and in response to the summary judgment motion. However, for context, a brief recital of the parties' positions with respect to the motion is warranted.

Hill asserts that it is entitled to summary judgment on the Negligence claim because Wärtsilä cannot demonstrate that it suffered damages during the period when LeFebvre worked as Hill's employee. (Hill's Reply Brief at 2.) In support, Hill interprets this Court's Opinion On Defendant's Motion To Dismiss and Opinion On Plaintiff's Motion For Reconsideration, filed September 29, 2000 and June 27, 2001 respectively, as restricting the claim for negligence to the four month time period during which LeFebvre was an employee of both Hill and Wärtsilä when the agreement was in effect. (Hill's Motion for Summary Judgment ("Hill's Mot.") at 10–12.) Further, during oral argument, Hill asserted that no damages arose out of

the four month period because LeFebvre performed his duties flawlessly during that time.

With respect to the Fraud claim, Hill maintains that summary judgment is appropriate in light of Wärtsilä's lack of evidence demonstrating several elements essential to maintain a fraud claim. Specifically, Hill asserts that Wärtsilä has not demonstrated the *scienter* element of this claim and that there is no evidence that: (1) Hill intentionally misrepresented LeFebvre's credentials to Wärtsilä, (2) Wärtsilä relied on Hill's alleged misrepresentations, and (3) Hills' alleged misrepresentations were not material. (*Id.* at 18–21.) Hill's argument with respect to summary judgment on the breach of contract claim is intertwined with its submissions on the fraud claim. Thus, Hill claims that the agreement between the parties frees Hill from liability for consequential damages and that in the absence of fraud, the limitation-of-liability provision of the agreement is enforceable. (*Id.* at 22.) Alternatively, Hill asserts that it did not breach the consulting agreement. (*Id.*)

In response to Hill's motion, Wärtsilä advances several arguments. First, it contends that Hill owed it a duty of care when the contract was formed and that Hill breached this duty by failing to verify LeFebvre's credentials and by providing Wärtsilä with a false resume. (Wärtsilä's Opposition Brief ("Wärtsilä's Opp.") at 7.) In this regard, Wärtsilä's position is that the duty and the corresponding breach were concurrent. According to Wärtsilä, this antecedent breach of duty, two years prior to the perjury of LeFebvre and within the time both Wärtsilä and Hill employed LeFebvre, set the chain of events in motion that resulted in damage to Wärtsilä. (*Id.*) Second, Wärtsilä contends that there is evidence to support the Fraud

claim as Hill was aware that LeFebvre did not have the credentials stated on his resume, that Wärtsilä relied upon Hill's material misrepresentations, and that the misrepresentations of Hill were indeed material. (*Id.* at 24–28.) Third, Wärtsilä asserts that summary judgment on the Breach of Contract claim is unwarranted because the limitation-of-liability provision of the consulting agreement is unenforceable in light of the Fraud claim. (*Id.* at 28.) Additionally, Wärtsilä contends that Hill breached the agreement by providing an unqualified consultant whose credentials and credibility were not as represented in the contract. (*Id.* at 29.)

Against this backdrop, the Court turns to the merits of Hill's motion for summary judgment. In so doing, the Court finds that there are genuine issues of material fact and, therefore, denies the Motion for Summary Judgment.

## C. COUNT I—NEGLIGENCE

This Court previously determined that Plaintiff's negligence claim is governed by New Jersey law. *See Wärtsilä v. Hill,* 99–4565 (D.N.J. September, 2000)(unpublished disposition). Additionally, this Court has addressed the sufficiency of Plaintiff's negligence claim, albeit under different standards.[5] Under New Jersey

law, a cause of action founded upon negligence has four essential elements: "(1) duty of care, (2) breach of duty, (3) proximate cause, and (4) actual damages." *Weinberg v. Dinger,* 106 N.J. 469, 484, 524 A.2d 366 (1987)(citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on the Law of Torts,* § 30 at 164–65 (5th ed.1984)). "The most common test of negligence ... is whether the consequences of the alleged wrongful act were reasonably to be foreseen as injurious to others coming in the range of such acts." *DiCosala v. Kay,* 91 N.J. 159, 175, 450 A.2d 508 (1982)(citing *Hill v. Yaskin,* 75 N.J. 139, 144, 380 A.2d 1107 (1977))(quoting 57 *Am.Jur.2d Negligence* § 58 (1970)(emphasis omitted)).

Hill contends that Wärtsilä cannot prove that it sustained damages during the time when Hill owed Wärtsilä a duty of care, asserting that it did not owe Wärtsilä a duty of care beyond the time that its relationship with LeFebvre and Wärtsilä ceased. Hill further asserts that fairness and public policy dictate that Hill is not liable for any alleged damages incurred by Wärtsilä after the cessation of Wärtsilä's relationship with Hill. Finally, with respect to the negligent hiring claim, Hill asserts that Wärtsilä has not demonstrated that

---

**5.** As previously noted, the Opinion dated September 29, 2000 dismissed Plaintiff's negligence claim in its entirety stating that any duty owed to Wärtsilä by Hill ceased when LeFebvre was no longer an employee of Hill and that Wärtsilä did not plead damages arising from the period of time in which LeFebvre was an employee of both Hill and Wärtsilä. However, upon reconsideration of that Opinion, the Court reinstated the negligence claim, finding that Wärtsilä had alleged damages potentially arising out of its relationship with LeFebvre as a Hill employee. *Wärtsilä v. Hill,* 99–4565 (D.N.J. June 27, 2001)(unpublished disposition). In so ruling, this Court noted that "[s]hould discovery fail to produce evidence that Plaintiff suffered damages *arising from* its relations with Le-

Febvre as a Hill employee, Defendant would be warranted in moving for summary judgment on the negligence claim." (*Id.* at 12)(emphasis added). The June 27, 2001 reconsideration opinion did not address the Amended Complaint, which, in addition to claims of negligent hiring and negligent misrepresentation, sets forth a more general claim of negligence. Further, the Opinion "merely cited one possible way in which Wärtsilä could sustain its claim under a theory of negligent hiring." *Wärtsilä v. Hill,* 315 F.Supp.2d at 628–30. Consequently, any limitations expressed by the Court in the June 27, 2001 reconsideration opinion with respect to the original negligence claim are not necessarily applicable to the negligence claim as set forth in the Amended Complaint. *See id.*

Hill knew of the misrepresentations contained in LeFebvre's resume on January 24, 1995, the day that Wärtsilä and Hill entered in to the consulting agreement.

Wärtsilä asserts that its negligence claim should survive summary judgment because there is evidence that Hill breached its duty of care by failing to verify LeFebvre's resume and that this breach set in motion the chain of events that lead to the damages incurred by Wärtsilä. Further, Wärtsilä avers that LeFebvre's alleged competent performance is of no consequence as the value of LeFebvre was tainted by the misrepresentations listed on his resume. In light of these arguments, the Court will now address whether there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

### 1. DUTY

■ The critical issue before the Court is whether a duty existed between Wärtsilä and Hill and, if so, to define the scope and duration of that duty. It is well established that whether a duty exists is an issue for the Court to decide.[6] *Woods Corp. Assoc. v. Signet Star Holdings*, 910 F.Supp. 1019, 1033 (D.N.J.1995). In New Jersey, duty is forward looking and is imposed where foreseeable events posing a risk of harm necessitate that a duty of due care be imposed. *LaRussa v. Four Points at Sheraton Hotel*, 360 N.J.Super. 156, 160, 821 A.2d 1168 (App.Div.2003). "The crucial element in determining whether or not to impose a duty rests on whether the defendant was reasonably able to comprehend that his conduct could injure as it did." *Ivins v. Town Tavern*, 335 N.J.Super. 188, 195, 762 A.2d 232, 236 (App.Div.2000)(citing *Taylor by Taylor v. Cutler*, 306 N.J.Super. 37, 45, 703 A.2d 294 (App.Div.1997)). "Foreseeability of injury to another is important, but not dispositive. Fairness, not foreseeability alone, is the test." *Kuzmicz v. Ivy Hill Park Apartments, Inc.*, 147 N.J. 510, 515, 688 A.2d 1018 (1997). Thus, ultimately, the question of whether one owes a duty to another is "a question of fairness [that] involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." *Kelly v. Gwinnell*, 96 N.J. 538, 544, 476 A.2d 1219, 1222 (1984)(quoting *Goldberg v. Housing Auth. Of Newark*, 38 N.J. 578, 583, 186 A.2d 291 (1962)).

■ Hill does not dispute that it owed a duty of care to Wärtsilä. (Hill's Mot. at 10.) However, Hill contends that this duty ceased at the moment that Wärtsilä hired LeFebvre away from Hill. The Court disagrees.[7] Considering the claims in the Amended Complaint, the Court holds that Hill owed a duty to Wärtsilä that transcended the life of the contractual relationship between the parties. The Court agrees with Hill's arguments that duty cannot go on forever and that the harm incurred must be reasonably foreseeable. Nonetheless, the Court holds that the duty in this case endured beyond the contractual period between the parties. To find otherwise would offend notions of fairness and public policy.

---

**6.** The parties agree that the existence of a duty is properly determined by the Court. However, in its opposition to the motion for summary judgment, Wärtsilä cites the deposition testimony William Loew as proof that Hill had a duty. (Wärtsilä Opp. at 7). Indeed, during his deposition testimony, William Loew acknowledged that Hill owed a duty of care to Wärtsilä. *See* Alderman Decl., Ex. D. Testimony of William Loew at 73. While this evidence is persuasive as to the existence of a duty, it is not determinative.

**7.** As previously stated the Court's June 2001 Opinion limiting the duty of care owed by Hill in this case is not necessarily applicable to the Amended Complaint, as the Court expressed no Opinion with respect to the Amended Complaint.

The relationship of the parties in this case warrants that a duty be imposed on Hill. *See Carvalho v. Toll Bros. & Developers*, 143 N.J. 565, 574, 675 A.2d 209 (1996)(stating that the relationship of the parties is an important factor in assessing whether a duty exists); *J.S. v. R.T.H.*, 155 N.J. 330, 339–40, 714 A.2d 924 (1998). First, although Wärtsilä placed LeFebvre on its own staff, LeFebvre remained an employee of Hill on at least one other project. Thus, as evidenced by the testimony of William Loew, Hill maintained some control over LeFebvre after his status changed.

Q. Did you at that time know that LeFebvre had entered into a personal services agreement with Hill?

A. My recollection is that he was moving, and since he was moving out of the area where Hill was located, that they wanted to keep him on board, and there was some sort if arrangement that they had made in terms of personal services. Keep him on board with the company.

Q. Exhibit 11, dated May 30, 1995, did you ever see or review this?

A. Peter Wallace signed this.

Q. And that would indicate, would it not that Mr. LeFebvre did continue or intend to continue his relationship with Hill?

A. That is correct.

\* \* \* \* \* \*

Q. So as far as relationship with Hill, Hill still had an active ongoing relationship with Mr. LeFebvre?

A. Yes.

(Test. of William Loew at 53–54, 56, Ex. D., Adelman Decl.) Further, Irvin Richter testified that Hill did not treat its employees differently, even if that employee was working as an independent contractor pursuant to a personal services agreement:

A. Not all employees are full-time employees or salaried employees. Some have different salary arrangements, contractual arrangements.

Q. Okay. And I'll get to that later, but you're talking about some of the consultants you have might be independent contractors as opposed to employees?

A. Yes.

\* \* \* \* \* \*

Q. Do you do the same with the independent contractors who you hire as consultants and assign to projects?

A. Typically, yes.

Q. Okay. And is that because their credentials are just as critical to you as the employee's credentials are as you previously testified?

A. Yes. The only thing different is how they're paid.

\* \* \* \* \* \*

Q. Does Hill in its treatment of employees versus independent contractors, does it on a project basis exercise the same type of control over employees as it does over independent contractors, you know how the work is to be done, how you're supposed to bill, time sheets, payment, the whole thing?

A. Yes. There would be little distinction from, you know, the outside. Outside wouldn't see much of a distinction at all, if any, . . . .

(Test. of Irvin Richter at 42–43; 66–67; 125–126, Ex.C., Adelman Decl.)

Another a fact underscores the finding of a duty in this case. Wärtsilä's negligence claim is born out of LeFebvre's involvement in the Nejapa Project, the very project that prompted Wärtsilä to contract with Hill for assistance. The alleged damages that Wärtsilä asserts arise

out of LeFebvre's involvement in the Nejapa project and the corresponding litigations. Thus, just because the manner in which LeFebvre was compensated changed does not vitiate the duty in this case; LeFebvre continued to work on the same project, for the same people, and had the same responsibilities as envisioned by the agreement. The Court finds that LeFebvre's independent contractor status does not foreclose Hill's responsibility to ensure the veracity of his credentials. Indeed, Hill maintained a duty to verify LeFebvre's credentials, regardless of LeFebvre's employment status as an independent contractor.

Moreover, fairness dictates that a duty be imposed on Hill. Hill owed a duty to Wärtsilä to ensure the veracity of Richard LeFebvre's resume. *See Clohesy v. Food Circus Supermarkets, Inc.*, 149 N.J. 496, 502, 694 A.2d 1017 (1997) ("Ultimately, the determination of the existence of a duty is a question of fairness and public policy"). As a consulting firm, Hill owed a duty to all of its clients and potential clients to ensure that its employees possessed the qualifications as stated on their resumes. During his deposition testimony, Hill's general counsel, David Richter, acknowledged that customers commonly rely on Hill's representations about the qualifications of Hill's people. (Wärtsilä's Opp. at 12; Test. of David Richter at 84–86, Adelman Decl., Ex. N.) Further, Hill's Senior Vice President William Loew testified that Hill's customers would not normally investigate Hill's employees' backgrounds. These facts support the Court's conclusion that it was reasonable for the customers to rely on Hill's assertions. (*See* Test. of William Loew at 68–69, Adelman Decl., Ex. D.) Loew agreed that part of what

Hill's customers paid for included the service of Hill's investigation into their consultants' backgrounds. (*Id.*) "The very reason we went to Hill was to obtain a claims expertise we didn't have in house." (Test. of John S. Weiss at 92, Adelman Decl., Ex. P.)

Hill's CEO and President Irvin Richter recognized the potential harm of failing to verify resumes, testifying that he initiated Hill's verification policy[8] to affirm the academic and professional credentials of its people. (*See* Test. of Irvin Richter at 24–26, Adelman Decl., Ex. C.) Richter explained the reasons underlying the policy:

> The type of work that we do in terms of providing consulting advice, often require certain types of registrations and educational credentials, and we wouldn't want to be in a position that we saw some of the other consulting firms then, which was too wiped up in litigation over the issue of whether the people that we're putting on the stand had the appropriate credentials. Credentials that they had claimed.

(*Id.*)

Based on this knowledge, it was not only reasonably foreseeable but actually foreseen that Hill's failure to verify its employees' resumes could have injurious consequences to its customers. Although there is no explicit reference to the potential that LeFebvre may ultimately serve as a witness, the issue of LeFebvre's credibility would no doubt impact the resolution of these conflicts. *See Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1369 (3d Cir. 1993) ("The type of foreseeability that determines a duty of care ... is not dependent on the foreseeability of a specific event."); *Suchomajcz v. Hummel Chem. Co.*, 524 F.2d 19, 28 n. 8 (3d Cir.1975)

---

8. The verification policy, according to the deposition testimony of Irvin Richter, required that all Hill employees sign a release of information form which permitted Hill's human resources department to verify the credentials listed on Hill's employees' resumes and applications. (*See generally* Test. of Irvin Richter, Adelman Decl., Ex. C.)

("The concept of foreseeability means the likelihood of the occurrence of a general type of risk rather than the likelihood of the occurrence of the precise chain of events leading to the injury."); Restatement (Second) of Torts § 435(1) ("[T]hat the actor neither foresaw nor should have foreseen the … manner in which [the harm] occurred does not prevent him from being liable."). Hill's contention that LeFebvre's perjury was not a foreseeable consequence is unpersuasive. Not only was the perjury a potential factor in the award, but Wärtsilä asserts that the damages were a combination of the "facts [LeFebvre] reported on, impressions that [LeFebvre] formulated, letters he authored … and claims management steps that he took … [that were] the basis for his anticipated testimony". (Pl. First Am. Compl. ¶ 68(a).) Thus, it is reasonably foreseeable that harm would result from LeFebvre's involvement in the project, even if the specific nature of the event causing the harm was not foreseen.

Additionally, Hill acknowledged that aside from its verification policy, it was easy for them to verify the contents of its consultants' credentials by having the employees produce copies of their degrees and licenses. (*See* Test. of David Richter at 15–16, Adelman Decl., Ex. N). This mitigates towards a finding that a duty of care existed. *See J.S.*, 155 N.J. at 339–40, 714 A.2d 924 ("When the defendant's actions are 'relatively easily corrected' and the harm sought to be prevented is 'serious' it is fair to impose a duty")(quoting *Kelly*, 96 N.J. at 549–50, 476 A.2d 1219). In this regard, it is not only fair, but reasonable to assume that Wärtsilä could rely on the qualifications averred by Hill with respect to LeFebvre for the resolution of the Nejapa project. (*See* Test. of William Loew at 68–69, Adelman Decl., Ex. D) (acknowledging that it would be reasonable for customers to rely on Hill's assessment of its consultants' credentials).)

## 2. BREACH

 There is evidence in the record sufficient to create a genuine issue of material fact as to whether Hill breached the duty owed to Wärtsilä.[9] As detailed

---

9. As a preliminary matter, the Court rejects Hill's contention that expert testimony is required in this case to establish the element of breach. "Expert testimony is required in cases of professional malpractice where the matter to be addressed is so esoteric that the average juror could not form a valid judgment as to whether the conduct of the professional was reasonable." *Sommers v. McKinney*, 287 N.J.Super.. 1, 10, 670 A.2d 99, 104 (App.Div.1996)(citing *Butler v. Acme Markets, Inc.*, 89 N.J. 270, 445 A.2d 1141 (1982)). In some professional malpractice cases, expert testimony will not be required to establish a breach. Specifically, where "the facts of a given case may be such that a layperson's common knowledge is sufficient to permit a finding that the duty of care has been breached." *Id.* (citing *Klimko v. Rose*, 84 N.J. 496, 503–04, 422 A.2d 418 (1980)). The Court finds that this case fits squarely within the exception and that expert testimony is not required in this case to establish whether Hill breached its duty to Wärtsilä by failing to authenticate LeFebvre's resume and/or by providing Wärtsilä with the services of an unqualified consultant. The determination of whether there was a breach in this case does not require specialized knowledge or a sophisticated understanding of the working of Wärtsilä's business. Instead, this matter presents the simple question of whether, in light of Hill's duty of care owed to Wärtsilä, Hill breached a duty to Wärtsilä by failing to verify the contents of LeFebvre's resume. More plainly, this case presents a question that the average layperson could answer by utilizing his or her general knowledge to determine the presence of a breach. In such cases, courts have not required expert testimony on the issue of breach. *See Hubbard by Hubbard v. Reed*, 168 N.J. 387, 774 A.2d 495 (2001)(no expert testimony required in case where dentist extracted wrong tooth); *Sommers*, 287 N.J.Super. at 12, 670 A.2d at 106 (no expert testimony needed to opine that attorney defendant "should have briefed an

above, this Court has found that Hill owed a duty of care to Wärtsilä to ensure that the credentials of LeFebvre were as listed on his resume and that this duty endured beyond the contractual period. In support of its contention that a genuine issue of material fact exists with respect to a breach of this duty, Wärtsilä approvingly cites *Davi v. Cabana Pools,* 135 N.J.Super. 372, 375, 343 A.2d 478 (App.Div.1975). In *Davi,* plaintiff and defendant had entered into a contract to install a pool on plaintiff's property. 135 N.J.Super. 372, 343 A.2d 478. A representative of defendant measured and evaluated the property and applied for the necessary permits for the installation of the pool, which was to be installed within plaintiff's property line. *Id.* at 374, 343 A.2d 478. However, the representative included disingenuous information on the permit application and did not inform the plaintiffs of the necessity for the permits. *Id.* at 375, 343 A.2d 478. As it turned out, the pool was installed in violation of the municipal zoning ordinance and plaintiffs undertook remedial action at their own expense. *Id.* Thereafter, plaintiffs sued defendants to recover the expenses associated with relocating the pool, alleging fraud, misrepresentation, and negligence. *Id.* In denying defendants' motion for summary judgment, the Appellate Division of the New Jersey Superior Court stated that the permits were dependant on the veracity and accuracy of the information contained in them and that the representative of defendant had a duty to verify the measurements before he applied for the permit. *Id.* at 376–77, 343 A.2d 478. Consequently, the court found that reasonable minds could differ as to whether defendants' representative exercised "that degree of care in the preparation and filing of the application that the reasonable prudent person under similar circumstances

would have exercised." *Id.* at 377, 343 A.2d 478.

During oral argument, Hill attempted to distinguish *Davi* from the present case. Hill argued that unlike the defendant in *Davi,* who did not perform competently during the contractual time period, in this case LeFebvre performed competently during the four months that the agreement was in effect. While this may be true, LeFebvre's performance is not the sole issue, at least as Wärtsilä sees it. Rather, Wärtsilä contends that the breach in this case occurred at the moment that the agreement was signed and Hill presented an unqualified consultant and when Hill supplied an updated resume for LeFebvre during the BVI litigation. The fact that LeFebvre performed satisfactorily does not vitiate the relevance of the reasoning in *Davi.* Instead, the admitted failure to verify LeFebvre's credentials and the misrepresentations with respect to LeFebvre's credentials occurred during the time period that the agreement was in effect. Accordingly, the reasoning in *Davi* is applicable in this case because the alleged breach was discovered at a later date, after the relationship of the parties had changed.

Here, Hill asserts that there is no evidence of breach because it supplied a consultant in LeFebvre who was qualified for the tasks for which he was acquired. Thus, the existence of breach is dependent upon whether Hill's failure to verify LeFebvre's credentials constitutes a breach in this case. After consideration of the evidence, the Court finds that a reasonable jury may answer this question positively for the following reasons. Hill asserts that the type of services Wärtsilä sought to obtain through Hill did not demand that LeFebvre possess any specialized degree and licenses, as Wärtsilä was looking for a

issue and that the failure to do so was a

breach of that duty to plaintiff.'').

"dirt on the boots" type of consultant. Thus, because LeFebvre's credentials were not essential for the performance of his duties for Wärtsilä, Hill contends there is no breach. Indeed, the deposition testimony of Kevin Curran indicates that he was responsible for contracting with Hill and that he was not concerned with the credentials of LeFebvre at the time Wärtsilä entered into the agreement with Hill.

> Q. Did you need, for the position that LeFebvre was to fill, a college graduate or a professional engineer?
>
> A. No, in fact I was asked that question by Mr. Wood prior to him recommending Mr. LeFebvre.

(Test. of Kevin Curran at 12–13, Ex. B.) Curran further stated that he "never intended to nor hired LeFebvre to work on claims preparation. His work was strictly as a consultant." (*Id.* at 19). Curran testified that he did not interpret LeFebvre's tasks on the project to include appearing as a fact witness in the event that the dispute between Wärtsilä and BVI resulted in litigation. (*Id.* at 90.) Although this evidence appears to mitigate against finding a breach in this case, certain aspects of Curran's testimony appear to be in contrast to this prior testimony. Specifically, at the time Wärtsilä entered in to the contract with Hill, Curran stated that he did anticipate a claim. (*Id.* at 93.) Indeed, this Court has recognized the inconsistencies in Curran's deposition testimony. *See Wärtsilä v. Hill*, 315 F.Supp.2d at 629. The Court stated:

> "[L]eaving aside the inconsistency of Curran's recollection and the conflicting inferences that can be drawn from his deposition testimony, it is clear that Curran's late acquired recollection is of no moment to the question of reliance at the time when decisions regarding LeFebvre's employment were being made.

Hill's proffer of this testimony for the present purposes is entirely misplaced." *Id.*

Furthermore, there is other evidence that contradicts Curran. The testimony of Torsten Astrom and Mark Schroeder indicates that they, in addition to Curran, were involved in negotiating the contract with Hill and that they anticipated needing help in filing claims. (Test. of Torsten Astrom at 29–38, Adelman Decl., Ex. Q; Test. of Mark Schroeder at 23–26, Adelman Decl., Ex. R). Additionally, there is evidence that the credentials of LeFebvre were essential to Wärtsilä, which indicate a breach in this case. Specifically, Hill recognized that its customers would rely on Hill's investigations into the credentials of its consultants. (*See* Test. of William Loew at 68–69, Adelman Decl., Ex. D.) Further, Hill acknowledged that it would have been easy to verify the credentials of LeFebvre. (*See* Test. of David Richter at 15–16, Adelman Decl., Ex. N.) Indeed, Hill's Chairman and CEO Irvin Richter viewed the failure to verify LeFebvre's resume as a "screw up". (Test. of Irvin Richter at 62, Adelman Decl., Ex. C.) Mr. Richter explained that Hill had a verification policy and that he was angry that human resources did not "do what they were supposed to do ... and what happened was what we were trying to prevent. That was the purpose of the policy." (*Id.*)

In light of the evidence, the Court is convinced that a reasonable jury could find that Hill breached its duty of care owed to Wärtsilä by failing to verify LeFebvre's credentials before Hill contracted with Wärtsilä for the Nejapa project.

### 3. *CAUSATION AND DAMAGES*

Hill asserts that there is no evidence linking the potential breach by Hill to the damages incurred by Wärtsilä following the various litigations. Additionally, Hill

asserts that there is no foreseeable cause and effect relationship between the potential breach and Wärtsilä's damages. Accordingly, Hill argues that summary judgment is appropriate because Wärtsilä did not sustain any damages during the period of time that Hill employed LeFebvre. In support, Hill notes this Court's September 2000 Opinion which limited the time period in which Hill owed a duty to Wärtsilä to that period of time where LeFebvre was employed by both Wärtsilä and Hill. Hill construes this opinion as requiring that Wärtsilä show evidence of damages incurred during this time frame. Further, Hill notes that Wärtsilä's response to Hill's Second Request for Documents, which was not supplemented, does not identify any damages caused by LeFebvre's actions prior to May 31, 1995.[10] Additionally, Hill asserts that all evidence points to competent work performed by LeFebvre.

██ Wärtsilä maintains that summary judgment is not warranted in this case because the breach by Hill, although occurring during the time period when LeFebvre was an employee of both Hill and Wärtsilä, triggered a chain of events that caused Wärtsilä's damages. Put differently, Wärtsilä asserts that Hill's breach was a contributing factor to the damages incurred during the arbitration and subsequent litigation. Although Wärtsilä concedes that its damages were accrued after the termination of the relationship between Hill and Wärtsilä, when LeFebvre was no longer a Hill employee, Wärtsilä maintains that the duty and breach occurred while LeFebvre was a Hill employee. In this regard, Wärtsilä, relying on *Tose v. Greate Bay Hotel and Casino, Inc.,* 819 F.Supp. 1312 (D.N.J.1993), asserts that the damages were the natural consequences of Hill's failure to verify LeFebvre's resume. In *Tose,* this District recounted New Jersey's foreseeability requirement for cases where a plaintiff is claiming economic loss. Specifically, a "plaintiff must show that the particular harmful event at issue would not have occurred but for the defendant's negligence." *Id.* at 1322 (citing *Kulas v. Public Service Elec. And Gas Co.,* 41 N.J. 311, 317 196 A.2d 769 (1964)). To recover economic damages, plaintiff must demonstrate that such damages were "reasonably to be anticipated in view of defendant's capacity to have foreseen that the particular plaintiff ... is demonstrably within the risk created by defendant's negligence." *Id.* (quoting *People Express Airlines, Inc. v. Consolidated Rail Corp.,* 100 N.J. 246, 267, 495 A.2d 107 (1985)).

██ Here, the Court finds that there is a genuine issue of material fact as to whether the damages sustained were the result of the potential breach by Hill for two reasons. First, the Court finds that there is evidence that Wärtsilä's damages arose out of the time period during which the agreement was in effect. In so finding, the Court rejects Hill construction of

---

10. Specifically, Hill's Second Request for Production of Documents, submitted on December 28, 2001 seeks "All documents reflecting or relating to any alleged errors, falsifications or other allegedly wrongful acts made or committed by LeFebvre prior to May 31, 1995". Wärtsilä's Response is as follows:

"Wärtsilä objects to this request as being overly broad. It further objects insofar as the request seeks information that was compiled by or at the direction of counsel in anticipation or, as the result of litigation, as such documents are protected from disclosure by the attorney-client and work product doctrine. Wärtsilä further objects to this request to the extent it seeks documents that are not in the possession of Hill International. Subject to and without waiving these objections, Wärtsilä states that it is unaware of any non-privileged documents responsive to this request."

(Plaintiff's Responses to Defendant's Second Request for Production of Documents, Ex. K at 6).

this Court's opinions as fixing the time period for damages as having to be incurred during the time frame that LeFebvre was employed by both Hill and Wärtsilä. Quite simply, Hill's interpretation in this regard is disingenuous. In the Opinion dated June 27, 2001, this Court limited the time frame for duty as to the original claim of negligence and stated that summary judgment would be appropriate if Wärtsilä fails to produce evidence that it suffered damages *"arising from"* its relations with LeFebvre as a Hill employee". *See Wärtsilä v. Hill,* 99–4565 (D.N.J. September 2000, June 2001)(unpublished dispositions); (Hill's Reply at 2–3.) In no way does this statement discount the damages incurred by Wärtsilä in connection with the BVI arbitration and the Kansas litigation from potentially being connected to Hill's breach of the duty of care.

Second, although Hill's evidence demonstrating that LeFebvre acted competently may factor into the assessment of damages, reasonable minds could differ as to whether it was LeFebvre's advice or credentials, or neither of these things, that lead to the damage award levied against Wärtsilä. In this regard, Wärtsilä has met its burden of demonstrating that there is a genuine issue of material fact as to whether Wärtsilä suffered damages arising out of Hill's breach of the duty of care. Specifically, Irvin Richter's deposition testimony that "what happened was what we were trying to prevent", could indicate to a jury that Hill was aware that their failure to verify LeFebvre's credentials was a direct and/or proximate cause of the damages sustained by Wärtsilä. (*See* Test. of Irvin Richter at 62, Adelman Decl., Ex. C.) Additionally, LeFebvre advised Wärtsilä to pursue litigation/arbitration, placing his credentials at issue, the very credentials that Hill allegedly failed to verify. Thus, whether or not the potential breach by Hill caused or was a contributing factor of the damages sustained by Wärtsilä following

the arbitration and Kansas litigation is a question for the jury to decide.

## 4. NEGLIGENT HIRING /NEGLIGENT MISREPRESENTATION

■ New Jersey recognizes the tort of negligent hiring. *See DiCosala,* 91 N.J. at 174, 450 A.2d 508. In *DiCosala,* the New Jersey Supreme Court opined that a claim for negligent hiring requires a showing of two fundamental elements. First, "[a]n employer will only be held responsible for the torts of its employees beyond the scope of the employment where it knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons." *Id.* at 173, 450 A.2d 508. Second, Plaintiff must show that "through the negligence of the employer in hiring the employee, that latter's incompetence, unfitness or dangerous characteristics proximately caused the injury." *Id.* at 174, 450 A.2d 508 (citing *Hathcock v. Mitchell,* 173 So.2d 576, 584, 277 Ala. 586 (1965)). Thus, the New Jersey Supreme Court noted that the tort of negligent hiring provides redress for the "negligence of the employer in the hiring or retention of employees whose qualities unreasonably expose the public to a risk of harm." *Id.*

■ New Jersey also recognizes the claim of negligent misrepresentation. Under New Jersey law, "[a]n incorrect statement, negligently made and justifiably relied upon, may be the basis for recovery of damages for economic loss or injury sustained as a consequence of that reliance." *H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 461 A.2d 138, 142–43 (1983). Hill contends that Wärtsilä cannot show that Hill knew of the misrepresentations contained in LeFebvre's resume on January 24, 1995, the day that the contract between Hill and

Wärtsilä was entered into. (Hill's Mot. at 15)(citing Restatement Second of Torts, § 552(1); *Alexander v. CIGNA Corp.*, 991 F.Supp. 427, 440 (D.N.J.1998)(negligent hiring requires showing that the "defendant made an incorrect statement, upon which the plaintiff justifiably relied".)) Additionally, Hill asserts that there is no evidence that Hill actually knew about misrepresentations prior to the BVI arbitration. (*See* Test. of Alann Ramirez at 10–11, Exhibit R.) Further, Hill contends that there is no evidence that Hill should have known of the misrepresentations at the time that it hired LeFebvre. (Hill's Mot. at 16.) Notwithstanding, Hill contends that LeFebvre's position was not the type that required professional credentials, as it was a "dirt on the boots" job. (*Id.* at 16; Test. of David Richter at 78, Exhibit S ("LeFebvre's resume for the work that he was doing when he was at Hill, as far as the degrees and credentials for licensing, was really irrelevant") at 90 ("[LeFebvre] didn't do anything while he was at Hill on behalf of any customer that required him to be a professional engineer, required him to be a college graduate").)

There is no dispute that the credentials listed on LeFebvre's resume are false. Wärtsilä, citing *Wlasiuk v. McElwee*, 334 N.J.Super. 661, 760 A.2d 829 (App.Div. 2000), asserts that Hill had duty to check LeFebvre's resume. Additionally, Wärtsilä contends that the verification policy employed by Hill created a duty to check LeFebvre's credentials before listing them on his resume and other Hill materials. (Wärtsilä's Opp. at 18.) In light of this verification policy, Wärtsilä asserts that Hill knew or should have known that LeFebvre's credentials were not as stated on his resume. (*Id.*) Further, Wärtsilä contends that LeFebvre had put information regarding his credentials on an employment application that was inconsistent with the credentials listed on LeFebvre's resume for Hill. (*Id.*)

Indeed, none of the Hill deponents testified that they knew of the falsity of LeFebvre's resume. To the contrary, at least one Hill representative testified that he was shocked to learn that LeFebvre was a fraud. (*See, e.g.,* Test. of William Loew at 66, Ex. P.) However, there is evidence in the record that could lead a jury to conclude that Hill knew or should have known of the falsity of LeFebvre's resume. Specifically, the testimony of Irvin Richter establishes that there was a policy in place requiring that Hills' human resources department verify the credentials of Hill's employees and that, in LeFebvre's case, human resources failed to adhere to that policy. (*See* Test. of Irvin Richter at 62, Adelman Decl., Ex. C.) Additionally, Wärtsilä attaches a copy of an employment application that LeFebvre submitted to a subsidiary of Hill in 1991 that lists credentials inconsistent with those on his resume. (*See* Employment Application of Richard LeFebvre to Gibbs & Hill, Adelman Decl., Ex. O.) These facts demonstrate an issue of whether Hill knew or should have known of the falsity of LeFebvre's resume. Finally, during the BVI arbitration, LeFebvre contacted Hill for an updated resume after questions concerning his credentials arose. A reasonable jury could infer that by producing the revised resume, Hill was aware of the problems with the initial resume.

As there is conflicting evidence regarding whether Hill knew about the falsity of LeFebvre's credentials, the Court finds that there is a genuine issue of material fact as to whether Hill was negligent. Summary judgment as to this count is accordingly denied.

### D. COUNT II—FRAUD

■ Five elements must be established to make out a claim for fraud under New Jersey law: (1) a material misrepresenta-

tion of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Gennari v. Weichert Realtors*, 148 N.J. 582, 691 A.2d 350, 367 (1997). Hill contends that Wärtsilä cannot prove at least three of the requirements. Specifically, Hill asserts that there is no evidence in the record that Hill intentionally misrepresented the credentials of LeFebvre, that Wärtsilä relied on the credentials of LeFebvre, and that the alleged misrepresentations were material. Additionally, Hill contends that there is no evidence that Hill knew that LeFebvre's credentials were false at the time that the parties entered into their contract. Instead, Hill asserts that the evidence demands a contrary conclusion as William Loew, a Hill employee, testified that he was flabbergasted to learn that LeFebvre lied on his resume. (*See* Test. of William Loew at 66, Ex. P.) Additionally, Hill asserts that the evidence shows that Kevin Curran, who was responsible for the hiring of LeFebvre, knew about the misrepresentations contained in LeFebvre's resume. (*See* Test. of John S. Weiss at 133, Ex. B, Hill's Reply.) Further, there is evidence that Wärtsilä did not rely on LeFebvre's resume and that the alleged misrepresentations were not material as Kevin Curran testified that he never relied on the credentials and that the credentials did not drive his hiring decision. (Test. of Kevin Curran at 12–15, Ex. B.)

■ The Court finds that Wärtsilä has demonstrated evidence in the record that creates a genuine issue of material fact as to the fraud count. Specifically, the Court finds that the employment application contained in Hills' files, that LeFebvre tendered to a Hill subsidiary in 1991, creates a genuine issue of fact as to whether Hill was aware that LeFebvre's credentials were fraudulent at the time Hill contracted

with Wärtsilä. Likewise, the updated resume produced by a Hill employee, at LeFebvre's request, during the BVI arbitration could indicate that Hill had knowledge that LeFebvre's credentials were not as listed on his original Hill resume. Further, there is conflicting evidence regarding whether the alleged misrepresentations were material. Although Hill cites to the deposition testimony of Kevin Curran, which avers that Curran did not place any weight on the credentials of LeFebvre, there is evidence that Wärtsilä was relying on the proffered expertise of Hill. "The very reason we went to Hill was to obtain a claims expert that we did not have in house. We sat down with these folks, they—we got pitched". (Test. of John Weiss at 92–93, Adelman Decl., Ex. P.) Additionally, Curran asked Weiss to "help [Curran] figure out whether we got the right guys" with respect to claims management. (*Id.* at 57) Weiss also disagreed with Curran's statement that LeFebvre was not hired as a claims consultant. (*Id.* at 56.) Further, Weiss explained that the decision to hire Hill was not Curran's alone; it included input from Torsten Astrom, Terry Sirois, and Mark Schroeder. (*Id.* at 53–57; Test. of Torsten Astrom at 29–38, Adelman Decl., Ex. Q; Test. of Mark Schroeder at 23–26, Adelman Decl., Ex. R).

Moreover, as previously noted, this Court recognized the inconsistencies in Curran's deposition testimony. *See Wärtsilä v. Hill*, 315 F.Supp.2d at 629. Therefore, the testimony of Kevin Curran is not dispositive with respect to whether Wärtsilä relied on Hill's representations or whether the alleged misrepresentations were material. Instead, in light of the deposition testimony of Wärtsilä employees Schroeder, Weiss, Astrom, and Sirois, there appears to be a genuine issue of material fact with respect to whether Wärtsilä relied on Hill's representations

and whether the alleged misrepresentations were material. Accordingly, summary judgment on the Fraud count is not appropriate in this case.

### E. COUNT IV—BREACH OF CONTRACT

Hill moves for summary judgment on the breach of contract count on grounds that the consulting agreement between the parties, dated January 25, 1995, contained a limitation-of-liability clause that precludes recovery under this theory. Specifically, Hill relies on language that it inserted in the agreement which allegedly precludes Wärtsilä from seeking compensatory damages in this case. The inserted language provides that:

> In no event shall Consultant [Hill] be liable in contract or tort or otherwise, to Company [Wärtsilä] for any lost, delayed or diminished profits, revenues, or opportunities, losses by any reason of shutdown or inability to utilize or complete the Project, or any other incidental, special, indirect, or consequential damages of any kind or nature whatsoever resulting from Consultant's performance or failure to perform services under this agreement.

(Consulting Agreement at 10, insert 2, Ex. A.) The Court has ruled that the law of the State of Maryland governs the Breach of Contract claim. *See Wärtsilä v. Hill,* 99–4565 (D.N.J. September 2000)(unpublished disposition). In so ruling, the Court interpreted the above clause as "operat[ing] to bar plaintiff's breach of contract claim" unless Wärtsilä can show that "it was deceived into accepting the contract." *Id.* (citing *Martens Chevrolet v. Seney,* 439 A.2d 534, 539 n. 7, 292 Md. 328, 338 (1982)).

Hill contends that because Wärtsilä cannot demonstrate fraud, the consulting agreement is binding on Wärtsilä and precludes an award of damages in this regard.

Hill maintains that summary judgment is warranted based on this fact alone. Alternatively, Hill contends that it did not breach the consulting agreement. In support of this contention, Hill asserts that although the proposal was included into the agreement, this did not warrant the veracity of LeFebvre's resume. Further, Hill asserts that it did not agree to provide claims support services to Wärtsilä, a contention that Hill supports as follows. First, Hill asserts that this Court has recognized that Hill did not agree to provide claims support or claims related services. *See Wärtsilä v. Hill,* 99–4565 (D.N.J. September 2000)(unpublished disposition)(noting that there was no explicit reference in the agreement to claims support). Second, Hill cites extrinsic evidence tending to show that claims support was not contemplated by the agreement. (*See* Test. of William Loew at 33–37, Ex. A; Test. of Kevin Curran at 10–11, Ex. B). Finally, Hill asserts that LeFebvre testified during the BVI arbitration that he was not hired to provide claims-consulting services to Wärtsilä. (*See* Transcript of BVI Arbitration at 1857–1859, Ex. V). Hill also contends that it did not breach the contract because the perjury occurred two years after the consulting agreement terminated; Hill only owed duty during the time that the agreement was in effect.

 As an initial matter, the Court rejects Hill's preliminary argument that the limitation of liability provision precludes recovery by Wärtsilä. The Court has already stated that if Wärtsilä was deceived into entering the contract, Hill could not rely on the protection of the limitation of liability provision contained in the consulting agreement. *See Wärtsilä v. Hill,* 99–4565 (D.N.J. September 2000)(unpublished disposition). Today, the Court has found that there exists a genuine issue of material fact as to whether Hill's repre-

sentations with respect to LeFebvre's credentials constitute fraud. Consequently, as the Fraud count will go to the jury, the Court cannot dispose of the Breach of Contract claim based on the limitation-of-liability clause contained in the agreement. Accordingly, the Court must address whether there is a genuine issue of material fact as to whether Hill breached the consultation agreement.

Hill's contention that there is no breach of the consultation agreement because Hill did not warrant the veracity of LeFebvre's resume is not dispositive of the breach of contract claim. While this may constitute a valid argument, the fact that the resume was incorporated into the consulting agreement creates a genuine issue of fact as to whether the agreement was breached. Specifically, there is a question of whether Hill breached the agreement by failing to provide a consultant who possessed the qualifications as listed in the agreement. Indeed, this Court recognized that the incorporation of LeFebvre's resume into the agreement established the Breach of Contract claim. *See Wärtsilä v. Hill,* 99–4565 (D.N.J. September 2000)(unpublished disposition). It is best left to a jury to decide whether, in the absence of a warranty as to LeFebvre's credentials, the fact that LeFebvre's resume was incorporated into the consulting agreement constitutes a breach of that consulting agreement.

██ Likewise, there is a question of fact regarding whether Hill agreed to provide claims-support to Wärtsilä. While the Court recognizes that the majority of the evidence suggests that the relationship between Hill and Wärtsilä did not contemplate claims-support, there is extrinsic evidence in the record that may cause reasonable minds to differ as to the merits of this claim.[11] Particularly, Wärtsilä references the January 18, 1995 proposal letter which was incorporated into the consulting agreement. This letter highlights Hill's experience in claims, stating "[f]rom our claims background, we often provide assistance to clients in the middle of a project in order to resolve claims and expedite completion." (Hill's January 18, 1995 Letter at 2, Adelman Decl., Ex. A.) The resumes of LeFebvre and Loew are also attached to the letter. As Wärtsilä points out, this is significant because Loew and LeFebvre were members of Hill's claims group. (*See* Test. of William Loew at 11–12, Adelman Decl., Ex. D.) The testimony of Loew also indicates that the filing of potential claims was trying to be avoided, but may have been contemplated. "The first goal here was to get the job done. Once the job was done, then you find out if there was damages, then take a look at who was responsible and see whether there was a chance of pursuing the claim." (*Id.* at 34.) Loew further stated that he hoped to get the job done quickly and that "if things go well there will be no need for a claim." (*Id.* at 35.)[12] Thus, despite the lack of an explicit reference to claims support in the agreement governing the parties relationship, in light of the extrinsic evidence put forth by Wärtsilä, it is possible that claims support was inherent in the tasks for which Loew and LeFebvre were

11. Under Maryland law, extrinsic evidence may be considered where the terms of the contract are ambiguous. *See Admiral Builders Savings & Loan Assoc. v. South River Landing, Inc.,* 502 A.2d 1096, 1099, 66 Md. App. 124, 129–30 (1986).

12. The Court notes that Wärtsilä further states that "at all times it was known that LeFebvre's activities, particularly the information that he gathered, would be used in subsequent claims either by or against Wärtsilä." Wärtsilä offers no evidence to support this assertion, which is in direct contrast to the testimony of LeFebvre during the BVI arbitration.

retained and was indeed contemplated by the consulting agreement. Such a determination, however, is ultimately a question for the jury and not one properly disposed of through summary judgment.

Finally, Hill's assertion the alleged breach of the agreement did not take place until two years after the consulting agreement was no longer in effect does not warrant summary judgment as any potential breach would have occurred when Hill incorporated LeFebvre's resume into the consulting agreement. For the forgoing reasons, the Court denies summary judgment as to the Breach of Contract claim.

## IV. CONCLUSION

The Court finds that Hill owed a duty of care to Wartsila to ensure the veracity of LeFebvre's credentials and that this duty continued until resolution of the NeJapa project. Additionally, the Court finds that there are genuine issues of material fact that preclude summary judgment as to the claim of negligence. Likewise, the Court finds that reasonable minds could differ over whether Hill perpetrated a fraud on Wartsila, precluding summary judgment. Consequently, the Court finds that the limitation-of-liability clause contained in the agreement may not be applicable in this case and that summary judgment with respect to the breach of contract claim is unwarranted.

An appropriate order will follow.

### ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56

**THIS MATTER** having come before the Court on the Motion of J. Ian Downes, Esquire and M. Frances Ryan, Esquire, of the law firm of Dechert, LLP, on behalf of Defendant Hill International, Inc., seeking summary judgment pursuant of Rule 56 of the Federal Rules of Civil Procedure as to the remaining claims of negligence, fraud, and breach of contract as set forth in Plaintiff Wartsila NSD North America Inc.'s Amended Complaint: and

**THE COURT** having fully considered the submission of the parties; and

**THE COURT** having conducted oral argument on October 20, 2004; and

**FOR THE REASONS** stated in an Opinion of the Court filed on even date,

**IT IS** on this 29th day of October, 2004, hereby

**ORDERED** that the Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 is **DENIED**.